RIVERS ET AL. *v.* ROADWAY EXPRESS, INC.

No. 92–938.  Argued October 13, 1993—Decided April 26, 1994

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined, *ante*, p. 286. BLACKMUN, J., filed a dissenting opinion, *post*, p. 314.

*Eric Schnapper* argued the cause for petitioners. With him on the briefs were *Elaine R. Jones, Charles Stephen Ralston, Cornelia T. L. Pillard, Kerry Scanlon,* and *Ellis Boal.*

*Solicitor General Days* argued the cause for the United States et al. as *amici curiae* urging reversal. On the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Turner, Deputy Solicitor General Wallace, Robert A. Long, Jr., David K. Flynn, Dennis J. Dimsey, Rebecca K. Troth,* and *Donald R. Livingston.*

*Glen D. Nager* argued the cause for respondent. With him on the brief were *John T. Landwehr* and *Thomas J. Gibney.**

JUSTICE STEVENS delivered the opinion of the Court.

Section 101 of the Civil Rights Act of 1991, Pub. L. 102–166, 105 Stat. 1071, defines the term "make and enforce contracts" as used in § 1 of the Civil Rights Act of 1866, Rev. Stat. § 1977, 42 U. S. C. § 1981, to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." We granted certiorari to decide whether § 101 applies to a case that arose before it was enacted. We hold that it does not.

---

*Briefs of *amici curiae* urging reversal were filed for the Asian American Legal Defense and Education Fund et al. by *Denny Chin, Doreena Wong,* and *Angelo N. Ancheta;* and for the National Women's Law Center et al. by *Judith E. Schaeffer* and *Ellen J. Vargyas.*

Briefs of *amici curiae* urging affirmance were filed for the American Trucking Associations et al. by *James D. Holzhauer, Andrew L. Frey, Kenneth S. Geller, Javier H. Rubinstein, Daniel R. Barney,* and *Kenneth P. Kolson;* and for Motor Express, Inc., by *Alan J. Thiemann.*

Briefs of *amici curiae* were filed for the Equal Employment Advisory Council et al. by *Robert E. Williams, Douglas S. McDowell,* and *Mona C. Zeiberg;* for the National Association for the Advancement of Colored People et al. by *Marc L. Fleischaker, David L. Kelleher, Steven S. Zaleznick, Cathy Ventrell-Monsees, Steven M. Freeman, Michael Lieberman, Dennis Courtland Hayes, Willie Abrams, Samuel Rabinove,* and *Richard Foltin;* and for Wards Cove Packing Co. by *Douglas M. Fryer, Douglas M. Duncan,* and *Richard L. Phillips.*

## I

Petitioners Rivers and Davison were employed by respondent Roadway Express, Inc., as garage mechanics. On the morning of August 22, 1986, a supervisor directed them to attend disciplinary hearings later that day. Because they had not received the proper notice guaranteed by their collective-bargaining agreement, petitioners refused to attend. They were suspended for two days, but filed grievances and were awarded two days' backpay. Respondent then held another disciplinary hearing, which petitioners also refused to attend, again on the ground that they had not received proper notice. Respondent thereupon discharged them.

On December 22, 1986, petitioners filed a complaint alleging that respondent had discharged them because of their race in violation of 42 U. S. C. § 1981.[1] They claimed, *inter alia,* that they had been fired on baseless charges because of their race and because they had insisted on the same procedural protections afforded white employees.

On June 15, 1989, before the trial commenced, this Court announced its decision in *Patterson* v. *McLean Credit Union,* 491 U. S. 164. *Patterson* held that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.,* at 171. Relying on *Patterson,* the District Court held that none of petitioners' discriminatory discharge claims were covered by § 1981, and dismissed their claims under that section. After a bench trial on petitioners' Title VII claims, the District Court found that petitioners had been discharged for reasons other than their race, and entered judgment for respondent.

---

[1] Petitioners' amended complaint also alleged claims against respondent under the Labor Management Relations Act, 1947, 61 Stat. 157, as amended, 29 U. S. C. § 185(a), and Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* as well as claims against their union. Those claims are not before us.

On appeal, petitioners contended that the District Court had misconstrued their complaint: They had not merely claimed discriminatory discharge, but more specifically had alleged that respondent had retaliated against them, because of their race, for attempting to enforce their procedural rights under the collective-bargaining agreement. Because that allegation related to "enforcement" of the labor contract, petitioners maintained, it stated a § 1981 claim even under *Patterson's* construction of the statute. While petitioners' appeal was pending, the Civil Rights Act of 1991 (1991 Act or Act) became law. Section 101 of that Act provides that § 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations.[2] Petitioners accordingly filed

---

[2] The full text of § 101, which is entitled "Prohibition Against All Racial Discrimination in the Making And Enforcement of Contracts," reads as follows:

"Section 1977 of the Revised Statutes (42 U. S. C. 1981) is amended—

"(1) by inserting '(a)' before 'All persons within'; and

"(2) by adding at the end the following new subsections:

"(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

"(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

Prior to the 1991 amendment, § 1981 provided:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The history of § 1981, which is sometimes cited as § 1977 of the Revised Statutes, is set forth in *Runyon* v. *McCrary,* 427 U. S. 160, 168–170, and n. 8 (1976).

a supplemental brief advancing the argument that the new statute applied in their case. The Court of Appeals agreed with petitioners' first contention but not the second. Accordingly, it ruled that § 1981 as interpreted in *Patterson*, not as amended by § 101, governed the case and remanded for a jury trial limited to petitioners' discrimination-in-contract-enforcement claim. See *Harvis* v. *Roadway Express, Inc.*, 973 F. 2d 490 (CA6 1992).

We granted certiorari, 507 U. S. 908 (1993), on the sole question whether § 101 of the 1991 Act applies to cases pending when it was enacted and set the case for argument with *Landgraf* v. *USI Film Products, ante,* p. 244.

## II

In *Landgraf,* we concluded that § 102 of the 1991 Act does not apply to cases that arose before its enactment. The reasons supporting that conclusion also apply to § 101, and require rejection of two of petitioners' submissions in this case. First, these petitioners, like the petitioner in *Landgraf,* rely heavily on a negative implication argument based on §§ 402(a), 109(c), and 402(b) of the Act. That argument, however, is no more persuasive as to the application of § 101 to preenactment conduct than as to that of § 102. See *ante,* at 257–263.

Second, petitioners argue that the case is governed by *Bradley* v. *School Bd. of Richmond,* 416 U. S. 696 (1974), rather than the presumption against statutory retroactivity. We are persuaded, however, that the presumption is even more clearly applicable to § 101 than to § 102. Section 102 altered the liabilities of employers under Title VII by subjecting them to expanded monetary liability, but it did not alter the normative scope of Title VII's prohibition on workplace discrimination. In contrast, because § 101 amended § 1981 to embrace all aspects of the contractual relationship, including contract terminations, it enlarged the category of conduct that is subject to § 1981 liability.

Moreover, § 1981 (and hence § 101) is not limited to employment; because it covers *all* contracts, see, *e. g., Runyon* v. *McCrary,* 427 U. S. 160 (1976), *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410 U. S. 431 (1973), a substantial part of § 101's sweep does not overlap Title VII.   In short, § 101 has the effect not only of increasing liability but also of establishing a new standard of conduct.[3]   Accordingly, for reasons we stated in *Landgraf,* the important new legal obligations § 101 imposes bring it within the class of laws that are presumptively prospective.

### III

Petitioners rely heavily on an argument that was not applicable to § 102 of the 1991 Act, the section at issue in *Landgraf.*   They contend that § 101 should apply to their case because it was "restorative" of the understanding of § 1981 that prevailed before our decision in *Patterson.*   Petitioners advance two variations on this theme: Congress' evident purpose to "restore" pre-*Patterson* law indicates that it affirmatively *intended* § 101 to apply to cases arising before its enactment;[4] moreover, there is a "presumption in favor of application of restorative statutes" to cases arising before their enactment.   Brief for Petitioners 37.

### A

Congress' decision to alter the rule of law established in one of our cases—as petitioners put it, to "legislatively overrul[e]," see *id.,* at 38—does not, by itself, reveal whether Congress intends the "overruling" statute to apply retroac-

---

[3] Even in the employment context, § 1981's coverage is broader than Title VII's, for Title VII applies only to employers with 15 or more employees, see 42 U. S. C. § 2000e(b), whereas § 1981 has no such limitation.

[4] See Brief for Petitioners 35 ("Congress sought to restore what it and virtually all the lower courts thought had been the reach of § 1981 prior to *Patterson*").

tively to events that would otherwise be governed by the judicial decision.[5]  A legislative response does not necessarily indicate that Congress viewed the judicial decision as "wrongly decided" as an interpretive matter.  Congress may view the judicial decision as an entirely correct reading of prior law—or it may be altogether indifferent to the decision's technical merits—but may nevertheless decide that the old law should be amended, but only for the future. Of course, Congress may also decide to announce a new rule that operates retroactively to govern the rights of parties whose rights would otherwise be subject to the rule announced in the judicial decision.  Because retroactivity raises special policy concerns, the choice to enact a statute that responds to a judicial decision is quite distinct from the choice to make the responding statute retroactive.

Petitioners argue that the structure and legislative history of § 101 indicate that Congress specifically intended to "restore" prior law even as to parties whose rights would otherwise have been determined according to *Patterson*'s interpretation of § 1981.  Thus, § 101 operates as a gloss on the terms "make and enforce contracts," the original language of the Civil Rights Act of 1866 that was before this Court in *Patterson*.  Petitioners also point to evidence in the 1991 Act's legislative history indicating legislators' distress with *Patterson*'s construction of § 1981 and their view that our decision had narrowed a previously established understand-

---

[5] Congress frequently "responds" to judicial decisions construing statutes, and does so for a variety of reasons.  According to one commentator, between 1967 and 1990, the Legislature "overrode" our decisions at an average of "ten per Congress."  Eskridge, Overriding Supreme Court Statutory Interpretation Decisions, 101 Yale L. J. 331, 338 (1991).  Seldom if ever has Congress responded to so many decisions in a single piece of legislation as it did in the Civil Rights Act of 1991.  See *Landgraf* v. *USI Film Products, ante,* at 250–251.

ing of that provision.[6] Taken together, petitioners argue, this evidence shows that it was Congress' sense that *Patterson* had cut back the proper scope of § 1981, and that the new legislation would restore its proper scope. Regardless of whether that sense was right or wrong as a technical legal matter, petitioners maintain, we should give it effect by applying § 101's broader definition of what it means to "make and enforce" a contract, rather than *Patterson*'s congressionally disapproved reading, to cases pending upon § 101's enactment.

We may assume, as petitioners argue, that § 101 reflects congressional disapproval of *Patterson*'s interpretation of

---

[6] Thus, for example, the Senate Report on the 1990 civil rights bill that was passed by Congress but vetoed by the President stated:

"The *Patterson* decision sharply cut back on the scope and effectiveness of section 1981, with profoundly negative consequences both in the employment context and elsewhere. As a result of the decision, the more than 11 million employees in firms that are not covered by Title VII lack *any* protection against racial harassment and other forms of race discrimination on the job.

.          .          .          .

"Since *Patterson* was announced, more than 200 claims of race discrimination have been dismissed by federal courts as a result of the decision. Statement of Julius LeVonne Chambers, Director-Counsel, NAACP Legal Defense and Educational Fund, Inc. (March 9, 1990). Many persons subjected to blatant bigotry lack any means to obtain relief.

.          .          .          .

"The Committee finds that there is a compelling need for legislation to overrule the *Patterson* decision and ensure that federal law prohibits all race discrimination in contracts." S. Rep. No. 101–315, pp. 12–14 (1990). Congress' concern with the effects of the *Patterson* decision in specific cases, including cases in which plaintiffs had won judgments only to have them reversed after *Patterson* came down, see S. Rep. No. 315, at 13–14, doubtless explains why the 1990 legislation contained a special provision for the reopening of judgments. See Civil Rights Act of 1990, S. 2104, 101st Cong., 2d Sess., § 15(b)(3) (1990); see also *Landgraf, ante,* at 255–256, n. 8. Petitioners do not argue that the 1991 Act should be read to reach cases finally decided.

§ 1981. We may even assume that many or even most legislators believed that *Patterson* was not only incorrectly decided but also represented a departure from the previously prevailing understanding of the reach of § 1981. Those assumptions would readily explain why Congress might have wanted to legislate retroactively, thereby providing relief for the persons it believed had been wrongfully denied a § 1981 remedy. Even on those assumptions, however, we cannot find in the 1991 Act any clear expression of congressional intent to reach cases that arose before its enactment.

The 1990 civil rights bill that was vetoed by the President contained an amendment to § 1981, identical to § 101 of the 1991 Act, that assuredly would have applied to pending cases. See Civil Rights Act of 1990, S. 2104, 101st Cong., 2d Sess., § 12 (1990). See also *Landgraf, ante,* at 255–256, n. 8. In its statement of purposes, the bill unambiguously declared that it was intended to "respond to the Supreme Court's recent decisions by *restoring* the civil rights protections that were dramatically limited by those decisions," S. 2104, § 2(b)(1) (emphasis added), and the section responding to *Patterson* was entitled "*Restoring* Prohibition Against All Racial Discrimination in the Making and Enforcement of Contracts." *Id.,* § 12 (emphasis added).[7] More directly, § 15(a)(6) of the 1990 bill expressly provided that the

---

[7] We do not suggest that Congress' use of the word "restore" necessarily bespeaks an intent to restore *retroactively.* For example, Congress might, in response to a judicial decision that construed a criminal statute narrowly, amend the legislation to broaden its scope; the preamble or legislative history of the amendment might state that it was intended to "restore" the statute to its originally intended scope. In such a situation, there would be no need to read Congress' use of the word "restore" as an attempt to circumvent the *Ex Post Facto* Clause. Instead, "to restore" might sensibly be read as meaning "to correct, from now on." The 1990 bill did not suffer from such ambiguity, however, for it contained other provisions that made pellucidly clear that Congress contemplated the broader, retroactive kind of "restoration."

amendment to § 1981 "shall apply to all proceedings pending on or commenced after" the date of the *Patterson* decision.

The statute that was actually enacted in 1991 contains no comparable language. Instead of a reference to "restoring" pre-existing rights, its statement of purposes describes the Act's function as *"expanding* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." 1991 Act, § 3(4), 105 Stat. 1071 (emphasis added). Consistently with that revised statement · of purposes, the Act lacks any direct reference to cases arising before its enactment, or to the date of the *Patterson* decision. Taken by itself, the fact that § 101 is framed as a gloss on § 1981's original "make and enforce contracts" does not demonstrate an intent to apply the new definition to past acts. Altering statutory definitions, or adding new definitions of terms previously undefined, is a common way of amending statutes, and simply does not answer the retroactivity question. Thus, the text of the Act does not support the argument that § 101 of the 1991 Act was intended to "restore" prior understandings of § 1981 *as to cases arising before the 1991 Act's passage.*

The legislative history of the 1991 Act does not bridge the gap in the text. The statements that most strongly support such coverage are found in the debates on the *1990* bill. See n. 6, *supra.* Such statements are of questionable relevance to the 1991 Act, however, because the 1990 provision contained express retroactivity provisions that were omitted from the 1991 legislation. The statements relating specifically to § 101 of the 1991 Act do not provide reliable evidence on whether Congress intended to "restore" a broader meaning of § 1981 with respect to pending cases otherwise governed by *Patterson's* construction of the scope of the phrase "make and enforce contracts."[8] Thus, the fact that § 101

---

[8] The legislative history of the 1991 Act reveals conflicting views about whether § 101 would "restore" or instead "enlarge" the original scope

was enacted in response to *Patterson* does not supply suffi-
cient evidence of a clear congressional intent to overcome
the presumption against statutory retroactivity.

B

A lack of clear congressional intent would not be disposi-
tive if, as petitioners argue, §101 is the kind of restorative
statute that should presumptively be applied to pending
cases. Petitioners maintain that restorative statutes do not
implicate fairness concerns relating to retroactivity at least
when, as is the case in this litigation, the new statute simply
enacts a rule that the parties believed to be the law when
they acted.[9] Indeed, *amici* in support of petitioners con-
tend, fairness concerns positively favor application of §101
to pending cases because the effect of the *Patterson* decision

---

of §1981. Compare, *e. g.*, 137 Cong. Rec. H9526 (Nov. 7, 1991) (remarks
of Rep. Edwards), with *id.*, at H9543 (Nov. 7, 1991) (remarks of Rep.
Hyde). The history also includes some debate over the proper test for
*courts* to apply—specifically, the *"Bradley"* presumption or the *"Bowen"*
presumption, see *Landgraf, ante*, at 263–265—to determine the applicabil-
ity of the various provisions of the Act to pending cases. Compare, *e. g.*,
137 Cong. Rec. 30340 (1991) (remarks of Sen. Kennedy) (citing *Bradley*
test), with *id.*, at 29043–29044 (remarks of Sen. Danforth) (favoring *Bowen*
test). As we noted in *Landgraf, ante*, at 262–263, the legislative history
reveals that retroactivity was recognized as an important and controver-
sial issue, but that history falls far short of providing evidence of an agree-
ment among legislators on the subject.

[9] They point out that respondent has no persuasive claim to unfair
surprise, because, at the time the allegedly discriminatory discharge oc-
curred, the Sixth Circuit precedent held that §1981 could support a claim
for discriminatory contract termination. See, *e. g.*, *Cooper* v. *North Olm-
stead*, 795 F. 2d 1265, 1270, n. 3 (1986); *Leonard* v. *City of Frankfort Elec.
and Water Plant Bd.*, 752 F. 2d 189, 195 (1985). See also *Mozee* v. *Ameri-
can Commercial Marine Service Co.*, 963 F. 2d 929, 941 (CA7 1992) (Cu-
dahy, J., dissenting); *Gersman* v. *Group Health Assn., Inc.*, 975 F. 2d 886,
907–908 (CADC 1992) (Wald, J., dissenting), cert. pending, No. 92–1190.
We note, however, that this argument would not apply to any cases arising
after *Patterson* was decided but before the 1991 Act's enactment.

was to cut off, after the fact, rights of action under § 1981 that had been widely recognized in the lower courts, and under which many victims of discrimination had won damages judgments prior to *Patterson.* See Brief for NAACP et al. as *Amici Curiae* 7–14.

Notwithstanding the equitable appeal of petitioners' argument, we are convinced that it cannot carry the day. Our decisions simply do not support the proposition that we have espoused a "presumption" in favor of retroactive application of restorative statutes. Petitioners invoke *Frisbie* v. *Whitney,* 9 Wall. 187 (1870), which involved a federal statute that enabled Frisbie and others to acquire property they had occupied and thought they owned prior to 1862, when, in another case, this Court held that the original grant of title by the Mexican Government was void.[10] The new law in effect "restored" rights that Frisbie reasonably and in good faith thought he possessed before the surprising announcement of our decision. In the *Frisbie* case, however, the question was whether Congress had the *power* to enact legislation that had the practical effect of restoring the status quo retroactively. As the following passage from *Frisbie* demonstrates, there was no question about Congress' actual intent:

> "We say the benefits it designed to confer, because we entertain no doubt of the *intention* of Congress to secure to persons situated as Frisbie was, the title to their lands, on compliance with the terms of the act, and if this has not been done it is solely because Congress

---

[10] See *United States* v. *Vallejo,* 1 Black 541 (1862). In his dissent in that case, Justice Grier stated that he could not "agree to confiscate the property of some thousand of our fellow-citizens, who have purchased under this title and made improvements to the value of many millions, on suspicions first raised *here* as to the integrity of a grant universally acknowledged to be genuine in the country where it originated." *Id.,* at 555–556 (emphasis in original).

had no power to enact the law in question." *Id.*, at 192 (emphasis in original).

Petitioners also point to *Freeborn* v. *Smith*, 2 Wall. 160 (1865). There, a statute admitting Nevada to the Union had failed to provide for jurisdiction over cases arising from Nevada Territory that were pending before this Court when Nevada achieved statehood. We upheld against *constitutional* attack a subsequent statute explicitly curing the "accidental impediment" to our jurisdiction over such cases. See *id.*, at 173–175.

In the case before us today, however, we do not question the power of Congress to apply its definition of the term "make and enforce contracts" to cases arising before the 1991 Act became effective, or, indeed, to those that were pending on June 15, 1989, when *Patterson* was decided. The question is whether Congress has manifested such an intent. Unlike the narrow error-correcting statutes at issue in *Frisbie* and *Freeborn*, § 101 is plainly not the sort of provision that must be read to apply to pending cases "because a contrary reading would render it ineffective." *Landgraf, ante,* at 286. Section 101 is readily comprehensible, and entirely effective, even if it applies only to conduct occurring after its effective date. A restorative purpose may be relevant to whether Congress specifically intended a new statute to govern past conduct, but we do not "presume" an intent to act retroactively in such cases.[11] We still require clear evidence of intent to impose the restorative statute "retroactively." Section 101, and the statute of which it is a part, does not contain such evidence.

"The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to

---

[11] See N. Singer, Sutherland on Statutory Construction § 27.04, p. 472 (5th ed. 1993) ("The usual purpose of a special interpretive statute is to correct a judicial interpretation of a prior law which the legislature considers inaccurate. Where such statutes are given any effect, the effect is prospective only").

every law student," *United States* v. *Security Industrial Bank*, 459 U. S. 70, 79 (1982), and this case illustrates the second half of that principle as well as the first. Even though applicable Sixth Circuit precedents were otherwise when this dispute arose, the District Court properly applied *Patterson* to this case. See *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule"). See also *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349, 372 (1910) ("Judicial decisions have had retrospective operation for near a thousand years") (Holmes, J., dissenting). The essence of judicial decisionmaking—applying general rules to particular situations—necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation. See L. Fuller, Morality of Law 56 (1964) ("No system of law—whether it be judge-made or legislatively enacted—can be so perfectly drafted as to leave no room for dispute").

*Patterson* did not overrule any prior decision of this Court; rather, it held and therefore established that the prior decisions of the Courts of Appeals which read § 1981 to cover discriminatory contract termination were *incorrect*. They were not wrong according to some abstract standard of interpretive validity, but by the rules that necessarily govern our hierarchical federal court system. Cf. *Brown* v. *Allen*, 344 U. S. 443, 540 (1953) (Jackson, J., concurring in result). It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law. A judicial construction of a statute is an authoritative state-

ment of what the statute meant before as well as after the decision of the case giving rise to that construction.[12]  Thus, *Patterson* provides the authoritative interpretation of the phrase "make and enforce contracts" in the Civil Rights Act of 1866 before the 1991 amendment went into effect on November 21, 1991.  That interpretation provides the baseline for our conclusion that the 1991 amendment would be "retroactive" if applied to cases arising before that date.

Congress, of course, has the power to amend a statute that it believes we have misconstrued.  It may even, within broad constitutional bounds, make such a change retroactive and thereby undo what it perceives to be the undesirable past consequences of a misinterpretation of its work product. No such change, however, has the force of law unless it is implemented through legislation.  Even when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the "corrective" amendment must clearly appear.  We cannot say that such an intent clearly appears with respect to § 101. For this reason, and because it creates liabilities that had no legal existence before the Act was passed, § 101 does not apply to preenactment conduct.

---

[12] When Congress enacts a new statute, it has the power to decide when the statute will become effective.  The new statute may govern from the date of enactment, from a specified future date, or even from an expressly announced earlier date.  But when this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law.  In statutory cases the Court has no authority to depart from the congressional command setting the effective date of a law that it has enacted.  Thus, it is not accurate to say that the Court's decision in *Patterson* "changed" the law that previously prevailed in the Sixth Circuit when this case was filed.  Rather, given the structure of our judicial system, the *Patterson* opinion finally decided what § 1981 had *always* meant and explained why the Courts of Appeals had misinterpreted the will of the enacting Congress.

Accordingly, the judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For opinion of JUSTICE SCALIA concurring in the judgment, see *ante*, p. 286.]

JUSTICE BLACKMUN, dissenting.

For the reasons stated in my dissent in *Landgraf* v. *USI Film Products, ante*, p. 294, I also dissent in this case. Here, just as in *Landgraf*, the most natural reading of the Civil Rights Act of 1991, 105 Stat. 1071, and this Court's precedents is that § 101 applies to cases pending on appeal on the statute's enactment date, at least where application of the new provision would not disturb the parties' vested rights or settled expectations. This is such a case.

In 1986, when respondent Roadway Express, Inc., discharged petitioners Maurice Rivers and Robert C. Davison from their jobs as garage mechanics, 42 U. S. C. § 1981, which gives all persons the same right to "make and enforce contracts,"[1] was widely understood to apply to the discriminatory enforcement and termination of employment contracts. See *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459–460 (1975) ("Although this Court has not specifically so held, it is well settled among the Federal Courts of Appeals—and we now join them—that § 1981 affords a federal remedy against discrimination in private employment on the basis of race"). This understanding comports with § 101 of the Civil Rights Act of 1991, 105 Stat. 1072, providing that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and

---

[1] Until the 1991 amendment, § 1981 stated: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."

the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The majority seemingly accepts petitioners' argument that if this Court were to apply § 101 to their case, "respondent has no persuasive claim to unfair surprise, because, at the time the allegedly discriminatory discharge occurred, the Sixth Circuit precedent held that § 1981 could support a claim for discriminatory contract termination." *Ante*, at 309, n. 9.

Nonetheless, applying a new, supercharged version of our traditional presumption against retroactive legislation, the Court concludes that petitioners, whose claim was pending when this Court announced *Patterson* v. *McLean Credit Union*, 491 U. S. 164 (1989), are bound by that decision, which limited § 1981 to contract formation. *Patterson*'s tenure was—or surely should have been—brief, as § 101 was intended to overrule *Patterson* and to deny it further effect. The Court's holding today, however, prolongs the life of that congressionally repudiated decision. See *Estate of Reynolds* v. *Martin*, 985 F. 2d 470, 475–476 (CA9 1993) (denying application of § 101 to cases pending at its enactment would allow repudiated decisions, including *Patterson*, to "live on in the federal courts for . . . years").

Although the Court's opinions in this case and in *Landgraf* do bring needed clarity to our retroactivity jurisprudence, they do so only at the expense of stalling the intended application of remedial and restorative legislation. In its effort to reconcile the "apparent tension," *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 837 (1990), between *Bradley* v. *School Bd. of Richmond*, 416 U. S. 696 (1974), and *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204 (1988), the Court loses sight of the core purpose of its retroactivity doctrine, namely, to respect and effectuate new laws to the extent consistent with congressional intent and with the vested rights and settled expectations of the parties. In *Bradley*, a unanimous Court applied an intervening statute allowing reasonable attorney's fees for school-

desegregation plaintiffs to a case pending on appeal on the statute's effective date. The Court observed that the statute merely created an "additional basis or source for the Board's potential obligation to pay attorneys' fees." 416 U. S., at 721.[2] Just as the school board in *Bradley* was on notice that it could be liable for attorney's fees, the employer in this case was on notice—from the prevailing interpretation of § 1981—that it could be liable for damages for a racially discriminatory contract termination. Indeed, in this case, the employer's original liability stemmed from the very provision that petitioners now seek to enforce.

In *Bowen,* by contrast, the Court unanimously interpreted authorizing statutes not to permit the Secretary of Health and Human Services retroactively to change the rules for calculating hospitals' reimbursements for past services provided under Medicare. Although *Bowen* properly turned on the textual analysis of the applicable statutes, neither citing *Bradley* nor resorting to presumptions on retroactivity, its broad dicta disfavored the retroactive application of congressional enactments and administrative rules. See 488 U. S., at 208. *Bowen* is consistent, however, with the Court's analysis in *Bennett* v. *New Jersey,* 470 U. S. 632 (1985), appraising the "[p]ractical considerations," *id.,* at 640, that counsel against retroactive changes in federal grant programs and noting that such changes would deprive recipients of "fixed, predictable standards." *Ibid. Bowen* also accords with *Bradley*'s concern for preventing the injustice that would result from the disturbance of the parties' reasonable reliance. Thus, properly understood, *Bradley* establishes a presump-

---

[2] Here, of course, § 101 creates a basis or source—in addition to Title VII—for the prohibition on racial discrimination in the enforcement of employment contracts. Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a)(1).

tion that new laws apply to pending cases in the absence of manifest injustice, and *Bowen* and *Bennett* stand for the corresponding presumption against applying new laws when doing so would cause the very injustice *Bradley* is designed to avoid.[3]

Applying these principles here, "[w]hen a law purports to restore the status quo in existence prior to an intervening Supreme Court decision, the application of that law to conduct occurring prior to the decision would obviously not frustrate the expectations of the parties concerning the legal consequences of their actions at that time." *Gersman* v. *Group Health Assn., Inc.*, 975 F. 2d 886, 907 (CADC 1992) (dissenting opinion). While § 101 undoubtedly expands the scope of § 1981 to prohibit conduct that was not illegal under *Patterson*,[4] in the present context § 101 provides a remedy for conduct that was recognized as illegal when it occurred, both under § 1981 and under Title VII. Thus, as far as respondent is concerned, the law in effect when it dismissed petitioners' claim differs little from the law as amended by the Civil Rights Act of 1991, and application of § 101 in this case would neither alter the expectations of the parties nor disturb previously vested rights. Because I believe that the most faithful reading of our precedents makes this the appropriate inquiry, I would reverse the judgment of the Court of Appeals and remand the case for further proceedings.

---

[3] An inquiry into the vested rights and settled expectations of the parties is fairer and more sensitive than a mechanical reliance on a substance/procedure dichotomy. See *Gersman* v. *Group Health Assn., Inc.*, 975 F. 2d 886, 906 (CADC 1992) (Wald, J., dissenting); *Mozee* v. *American Commercial Marine Service Co.*, 963 F. 2d 929, 940–941 (CA7 1992) (Cudahy, J., dissenting from denial of rehearing).

[4] Not all conduct proscribed by § 101 was also unlawful under Title VII or other civil rights laws. For example, § 101, unlike Title VII, see 42 U. S. C. § 2000e(b), applies to small employers, and even outside the employment context, see, *e. g., Runyon* v. *McCrary*, 427 U. S. 160 (1976).