Claude **RODRIGUEZ**, Jr., Plaintiff,

and

**Leroy Gibbs, Plaintiff–Appellant,**

v.

**GENERAL MOTORS CORPORATION,
et al., Defendant–Appellee.**

No. 91–55170.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 20, 1992.

Submission Deferred Aug. 20, 1992.

Resubmitted June 1, 1994.

Decided June 20, 1994.

Eric Schnapper, NAACP Legal Defense and Educ. Fund, New York City, for plaintiff-appellant.

Paul W. Cane and Stephen L. Berry, Paul, Hastings, Janofsky & Walker, Los Angeles, CA, for defendant-appellee.

Before: TANG and HALL, Circuit Judges, and SHUBB,* District Judge.

Opinion by Judge TANG.

TANG, Circuit Judge:

## I.

Leroy Gibbs, an African–American, was hired by the General Motors ("GM") Van Nuys plant in 1957. In 1977, he attained the position of "General Supervisor, Maintenance," at Salary Level 7. In 1980, Gibbs' department was reorganized; Gibbs was given responsibility over housekeeping, rather than other types of maintenance, though he retained the same job classification and compensation. Gibbs believed this constituted a demotion, and applied for a different Level 7 position with more responsibility within the Maintenance Department. GM instead promoted a Caucasian employee, Bob Potter. Gibbs filed this action under 42 U.S.C. § 1981.

The district court granted summary judgment for GM. We reversed and remanded to the district court after concluding that Gibbs had put forward enough evidence that material issues of fact remained in dispute. *Rodriguez v. General Motors Corp.*, 904 F.2d 531, 532 (9th Cir.1990).[1]

However, pending appeal, the Supreme Court had decided *Patterson v. McLean Credit Union*, which held that the denial of a promotion is not actionable under § 1981 unless the promotion was "an opportunity for a new and distinct relation between the employee and employer." 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). We indicated in our opinion that the parties should have the opportunity to address whether Gibbs' claim survived *Patterson. Rodriguez*, 904 F.2d at 534.

On remand, the district court granted summary judgment to GM on the basis that *Patterson* precluded Gibbs' claim under § 1981. Gibbs again appealed. Pending this appeal, however, Congress passed the Civil Rights Act of 1991, 105 Stat. 1071, P.L. 102–166 (1991) ("the Act"). Section 101 of the Act, codified at 42 U.S.C. § 1981(b), explicitly rejected *Patterson*'s restrictive reading of § 1981.

Submission of this case was deferred pending the Supreme Court's decisions in *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and *Rivers v. Roadway Express, Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994), regarding whether the Civil Rights Act of 1991 is to be applied retroactively. The Supreme Court held that certain provisions of the Act are not to be applied retroactively.

---

* Honorable William B. Shubb, United States District Judge for the Eastern District of California, sitting by designation.

1. Rodriguez and the remaining plaintiffs are no longer parties to this appeal.

*See Landgraf,* —— U.S. at ——, 114 S.Ct. at 1508 (1994) (§ 102); *Rivers,* —— U.S. at ——, 114 S.Ct. at 1519–20 (§ 101). We now take this case under submission, and affirm.

## II.

■ In *Landgraf,* the Supreme Court held that § 102 of the Act is not to be applied retroactively. First, the Court noted that Congress had not clearly stated its intent on retroactive application in the text of the Act. The Court rejected the argument that § 402(a), which states that "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment," implied that the Act should apply retroactively because two provisions of the Act, sections 109(c) and 402(b),[2] had explicit prospective application. 114 S.Ct. at 1493–95. The Court concluded that prospective application of the remaining sections of the Act would not render sections 109(c) and 402(b) meaningless; rather, the specific treatment regarding retroactivity in those sections simply reflected Congress' ability to come to a consensus on those specific issues. *Id.* at ——, 114 S.Ct. at 1495–96.

■ Because the Act did not evidence clear Congressional intent regarding retroactive application, the Supreme Court applied the judicial presumption against retroactive application of a new statute. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). A statute operates "retroactively" when it "attaches new legal consequences to events completed before its enactment," *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1499, or when it would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," *id.* at ——, 114 S.Ct. at 1505.

The Court explained that its statement in *Bradley v. Richmond Sch. Bd.,* 416 U.S. 696,

711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), that a court should "apply the law in effect at the time it renders its decision," did not contradict the general presumption against retroactive application. —— U.S. at ——, 114 S.Ct. at 1503. Rather, that case dealt with the award of attorney's fees, which are collateral to the main action, and which were previously available under equitable principles. *Id.* The new fee statute addressed in *Bradley* thus "did not impose an additional or unforeseeable obligation" on the defendant. *Id.* In contrast, § 102(b) of the Act, which authorizes compensatory and punitive damages in intentional discrimination cases, confers new rights on civil rights plaintiffs and thus is to be applied prospectively only. *Id.* —— U.S. at ——, at 1505–08.

In *Rivers,* the Court held that § 101 of the Act also did not apply retroactively. Section 101 "reversed" *Patterson,* 491 U.S. at 171, 109 S.Ct. at 2369–70, in which the Court held that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." Section 101 of the Act explicitly rejects *Patterson's* restrictive reading of 42 U.S.C. § 1981, and provides that the term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The Supreme Court held that § 101 created "important new legal obligations" by enlarging the category of conduct subject to § 1981 liability. *Rivers,* —— U.S. at ——, 114 S.Ct. at 1515.

The Court rejected the argument that § 101 should be applied retroactively because it enacted a rule which was in place prior to the *Patterson* decision, and thus would not impose unfair burdens on pre-*Patterson* conduct. *Id.* at ——, 114 S.Ct. at 1515–20. The Court held:

---

2. Section 109(c) provides that its extension of Title VII protection to United States citizens working for American companies overseas "shall not apply with respect to conduct occurring before the date of the enactment of this Act." Section 402(b) declares that "nothing in this Act shall apply to any disparate impact case for

which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983" (precluding application of the Act to pending litigation in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

*Patterson* did not overrule any prior decision of this Court; rather, it held and therefore established that the prior decisions of the Courts of Appeals which read § 1981 to cover discriminatory contract termination were *incorrect. . . . Patterson* provides the authoritative interpretation of the phrase "make and enforce contracts" in the Civil Rights Act of 1866 before the 1991 amendment went into effect on November 21, 1991. That interpretation provides the baseline for our conclusion that the 1991 amendment would be "retroactive" if applied to cases arising before that date. *Id.* at ——, 114 S.Ct. at 1519.

■ Because § 101 is not to be applied retroactively, we must decide whether the district court correctly granted summary judgment to GM under *Patterson.*[3]

### III.

■ *Patterson* imposed significant limits on the type of employment discrimination cases actionable under 42 U.S.C. § 1981. For cases brought prior to the Civil Rights Act of 1991, the scope of § 1981 is restricted "to forbidding discrimination in the 'mak[ing] and enforce[ment]' of contracts," 491 U.S. at 176, 109 S.Ct. at 2372, such as an employer's racially motivated refusal to enter into a contract with a minority applicant, as well as an offer to enter into a contract on discriminatory terms. *Id.* at 176–77, 109 S.Ct. at 2372–73. However, § 1981 does not extend to discriminatory "conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 177, 109 S.Ct. at 2372.

The Court also addressed the status of an employee's § 1981 claim regarding an employer's refusal to *promote* the employee. "[W]hether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981." *Id.* at 185, 109 S.Ct. at 2377. Directing the lower court to give a "fair and natural reading" to the language of § 1981, the Supreme Court noted that "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Id.* The Court cited *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (concerning the promotion of a lawyer from associate to partner in a law firm), as an example of such a "new and distinct relation." *Id.* 491 U.S. at 185–86, 109 S.Ct. at 2377.

In *Sitgraves v. Allied–Signal, Inc.,* 953 F.2d 570 (9th Cir.1992), the Ninth Circuit developed its first substantial elaboration of promotion claims under *Patterson.* We observed that *Patterson* "strongly suggests that, in addition to an increase in pay. and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship." *Id.* at 573. Among the salient changes are "the addition of supervisory duties; a change in the manner in which the contractual relationship can be terminated; a change in the method of compensation and acquisition of potential liability for firm obligations." *Id.*

In this case, Gibbs claims that although he officially remained a Level 7 General Supervisor, the duties and functions of his job had actually deteriorated to that of a Level 6 Supervisor. On that basis, Gibbs argues that in applying for another Level 7 General Supervisor position in the Maintenance Department, he was actually applying for a promotion. Furthermore, Gibbs contends that the difference between a Level 6 Supervisor and a Level 7 General Supervisor constitutes a new and distinct relationship with GM.

GM responds that since Gibbs was already a Level 7 manager, his application was simply for a lateral transfer, not for a promotion.

---

**3.** We review a grant of summary judgment de novo. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F.2d 626, 629 (9th Cir.1987). Viewing the evidence in the light most favorable to the nonmoving party, we must ask whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Tzung v. State Farm Fire and Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir. 1989).

If reassigned, Gibbs would have remained a General Supervisor in the Maintenance Department at the same salary level, reporting to the same person.

In order to determine whether Gibbs sought a "new and distinct relation[ship]" with GM, we will compare the supervisory duties, salary, chain of responsibility, and additional responsibilities of each position.

### A.

In support of his allegations that he was a *de facto* Level 6 employee, Gibbs contends that unlike other Level 7 General Supervisors, he did not manage Level 6 Supervisors. However, this contention is unsupported by the evidence. Gibbs' performance evaluations reflect that Gibbs did in fact supervise Level 6 supervisors. Moreover, Gibbs' own description of his job discusses his responsibility for supervising other supervisors.

Gibbs also maintains that, unlike other Level 7 employees, he supervised hourly employees and occasionally performed their duties. However, an affidavit submitted by the Manager of Human Resources at the GM plant indicates that several other Level 7 general supervisors also directed the work of hourly employees.

### B.

Gibbs also maintains that he was paid at a Level 6 salary and that Potter's position would have afforded him the opportunity to earn more money. In the year that Gibbs was denied the promotion (1985), the salary range for a Maintenance General Supervisor at Salary Level 7 was $2,110.50 to $4,208.96 per month. Gibbs was paid $3,701.80 per month, lower than the other general supervisors in Maintenance. Potter was paid $3,712.08, and the other general supervisors made $3,888.68, $4,188.12, and $4,129.10 per month. Although GM paid Gibbs less than other general supervisors in the Maintenance department, Gibbs failed to produce any evidence which would tend to show that he would have received more money if he had been given Potter's job. Nor has Gibbs produced any evidence which would suggest that

he was being paid as a Level 6 supervisor in his present position.

### C.

Gibbs maintains that if he had been given the position he sought, he would have reported to the Superintendent rather than to a general supervisor. However, Gibbs admitted in his deposition testimony that his supervisor was at all times a Level 8 Superintendent, primarily James Clark. This is confirmed by Gibbs' performance appraisals for 1984–85.

### D.

Gibbs maintains that if he had been given Potter's job, he would have had a number of new responsibilities. Gibbs specifically alleges that he would have negotiated labor agreements, been responsible for work done by the department, and assigned work assignments to the different shifts in the department.

Both Potter and Gibbs' performance evaluations reflect that there were no significant differences between the jobs. Moreover, the evidence demonstrates that Wayne Ellington, *not* Potter, was department coordinator for six months before and six months after Potter's promotion. Finally, Gibbs offered no evidence in support of his contention that Potter's position involved negotiating with the union.

### IV.

Under *Patterson v. McLean Credit Union,* the failure to promote is actionable under 42 U.S.C. § 1981 only if the new position entailed an opportunity for "a new and distinct relation between the employee and the employer," 491 U.S. at 185, 109 S.Ct. at 2377, such as an increase in pay, the addition of supervisory duties, or a change in the chain of responsibility. Gibbs failed to establish a genuine issue of material fact that the position denied to him would have constituted a new and distinct relationship with GM. The

district court correctly granted summary judgment to GM.

AFFIRMED.