

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-18-2000

# Zubi v. AT&T Corp.

Precedential or Non-Precedential:

Docket 99-5206

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Zubi v. AT&T Corp." (2000). *2000 Decisions.* Paper 148.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/148

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 18, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-5206

MADHAT ZUBI
Appellant

v.

AT&T CORP.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 98-cv-03424)
District Judge: Honorable Katharine S. Hayden

Argued November 17, 1999

BEFORE: ALITO and STAPLETON, Circuit Judges,
and FEIKENS,* District Judge

(Opinion Filed: July 18, 2000)

Louis A. Zayas (Argued)
440 60th Street - Suite 106
West New York, NJ 07093

 Attorney for Appellant

_____

* Honorable John Feikens, Senior United States District Judge for the
Eastern District of Michigan, sitting by designation.

         Christopher Walsh (Argued)
         Christopher H. Mills
         Collier, Jacob & Mills
         580 Howard Avenue
         Corporate Park III
         Somerset, NJ 08873

          Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Plaintiff-Appellant Madhat Zubi filed this civil action against AT&T Corporation, alleging that he was discharged because of his race in violation of 42 U.S.C. S 1981. The District Court dismissed the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), as barred by a two-year statute of limitations. Zubi argues that the District Court erred in applying a two-year statute of limitations instead of the four-year limitations period prescribed by 28 U.S.C. S 1658. We will affirm the judgment of the District Court.

I.

Mr. Zubi filed the complaint in this case on July 30, 1998, in the United States District Court for the District of New Jersey. It alleges that Zubi was discharged by AT&T because of his race on September 28, 1995. The District Court, applying the teachings of Wilson v. Garcia, 471 U.S. 261 (1985), and its progeny, "borrowed" New Jersey's two-year statute of limitations for personal injury cases and found Zubi's claim time barred.

Zubi's claim arises under 42 U.S.C. S 1981, which provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." In Patterson v. McLean Credit Union, 491 U.S. 164, 185 (1989), the Supreme Court held that the "make and enforce contracts" language of section 1981 proscribed discriminatory hiring but not discriminatory termination of employment.

2

Congress responded to the Patterson decision in the Civil Rights Act of 1991 by amending section 1981. The amendments, inter alia, made the preexisting language of section 1981, quoted above, subsection (a) and added a subsection (b) to section 1981 which defined the phrase "make and enforce contracts" as "the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." Civil Rights Act of 1991, Pub. L. No. 102-166, S 101, 105 Stat. 1071 (codified at 42 U.S.C. S 1981(b)) (emphasis added). Following the 1991 amendments, section 1981 "clearly prohibits discriminatory conduct that occurs both before and after the establishment of the contractual relationship." Perry v. Woodward, 199 F.3d 1126, 1132 (10th Cir. 1999) (emphasis added). Thus, the 1991 amendment to section 1981 "creates liabilities that had no legal existence before the Act was passed." Rivers v. Roadway Express, Inc., 511 U.S. 298, 313 (1994).

The issue presented to us is a purely legal one, which we review de novo. See Hotel Employees & Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Assocs., 173 F.3d 175, 181 (3d Cir. 1999). Zubi argues that the District Court erred in "borrowing" New Jersey's two-year statute of limitations for personal injury cases. Zubi bases his argument on 28 U.S.C. S 1658, which provides as follows:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

Section 1658 was enacted on December 1, 1990. See The Judicial Improvement Act of 1990, Pub. L. No. 101-650, Title III, S 313(a), 104 Stat. 5114. Zubi maintains that, by virtue of the 1991 amendments to section 1981, his lawsuit against AT&T is "a civil action arising under an Act of Congress enacted after [December 1, 1990]" and that section 1658's four-year limitation period governs.

Zubi's cause of action for discriminatory termination of employment is based on statutory language that has

3

existed unchanged since its original enactment in 1870. See Act of May 31, 1870, ch. 114, S 16, 16 Stat. 144. At the same time, it is clear that a person in his position could not have successfully pursued that claim prior to the 1991 amendments to the Civil Rights Act. We must decide whether, for purposes of section 1658, Zubi's claim arises under the preexisting statutory language on which his claim is based or under the 1991 amendments. As we will explain, we hold that Zubi's claim arises under the preexisting statutory language, now codified in 42 U.S.C. S 1981(a), and, therefore, that the District Court properly applied New Jersey's two-year statute of limitations for personal injury claims.

II.

Like virtually all of the courts that have preceded us in addressing the same issue, we find the text of S 1658 ambiguous; it can be, and has been, reasonably read in a number of different ways. See generally Boyd A. Byers, Adventures in Topsy-Turvy Land: Are Civil Rights Claims Arising Under 42 U.S.C. S 1981 Governed by the Federal Four-Year "Catch-All" Statute of Limitations, 28 U.S.C. S 1658?, 38 WASHBURN L.J. 509 (1999) (detailing the various approaches courts have taken). Three distinct approaches are recognized in the existing case law:

> 1. When an Act of Congress passed after December 1, 1990, creates a claim that did not previously exist, that claim "arises under an Act of Congress enacted after" December 1, 1990, even though the new statute creates the new claim by amending a previously existing statute. This view of S 1658, when applied in the context of S 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in S 1981 claims based on the discriminatory termination of contracts being governed by the four-year federal limitations period, and all other claims based on S 1981 being governed by the state statute for personal injury claims.[1]

---

1. See, e.g., Miller v. Federal Express Corp., 56 F. Supp.2d 955, 965 (W.D. Tenn. 1999).

2. When an Act of Congress passed after December 1, 1990, amends a statute existing before that date in a manner that substantially alters its meaning, all claims accruing after the passage of the new statute "arise under an Act of Congress enacted after" December 1, 1990, without regard to whether an identical claim arising earlier could have been successfully pursued under the prior statute. This view of S 1658, when applied in the context of S 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in all S 1981 claims arising after the 1991 amendment being governed by the four year federal limitations period.[2]

3. When an Act of Congress passed after December 1, 1990, amends a statute existing before that date, as opposed to creating new law without reference to previously existing statutory language, all claims accruing after the passage of the amendment arise under an Act of Congress enacted before December 1, 1990, without regard to whether an identical claim arising earlier could have been successfully pursued under the prior statute. This view, when applied in the context of S 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in all S 1981 claims accruing after the passage of the 1991 amendments being governed by the state limitations period for personal injury claims.[3]

Each of the foregoing interpretations is textually plausible.[4]

_____

2. See, e.g., Alexander v. Precision Machining, Inc., 990 F. Supp. 1304 (D. Kan. 1997).
3. See, e.g., Lane v. Ogden Entertainment, Inc., 13 F. Supp.2d 1261 (M.D. Ala. 1998).

4. It is true, as some courts have stressed, that statutory amendments become law only when an "Act" is enacted by Congress and that the phrase "Act of Congress" can reasonably be read to include any legislative measure that amends preexisting statutory text. On the other hand, treating every amendment to an existing statute as a new Act of Congress is not required by the text of S 1658. It is common parlance to refer to legislation like the Civil Rights Act of 1870 as an "Act of Congress" and to refer to causes of action as arising thereunder even though based on statutory provisions that have later been amended in some way.

Given that ambiguity, we turn to the rationale behind S 1658, as reflected in its text and legislative history, and seek to determine which reading of the statute will be most consistent with that rationale.5

Congress enacted S 1658 in response to calls for a new, nationally uniform statute of limitations for federal causes of action not having their own explicit limitations period. It did not, however, establish a new, nationally uniform federal statute of limitation for all federal causes of action. Congress could have provided that S 1658 would be applicable to all causes of action that accrued after the effective date of the Act, but it did not. It did not because

---

5. We thus respectfully disagree with the dissent's position that the "plain meaning" rule dictates the resolution of the issue before us. As the dissent points out, it is clear that Congress' authority under Article III of the Constitution to bestow jurisdiction on the federal courts includes what is referred to as "federal ingredient" jurisdiction -- jurisdiction over cases where the plaintiff 's claim is not created by federal law but where a federal question is an "ingredient" of the action. Osbourn v. Bank of the United States, 9 Wheat 734 (1824). It is equally clear, however, that "arising under" federal law in 28 U.S.C. S 1331, which grants federal question jurisdiction to the federal courts, has a narrower meaning than "arising under" federal law in Article III of the Constitution. Specifically, S 1331 "arising under" jurisdiction does not include "federal ingredient" jurisdiction where Congress has determined that there should be no private cause of action for violation of the federal law. Merrell Dow Pharmeceuticals, Inc. v. Thompson, 478 U.S. 804 (1986) ("a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim `arising under the Constitution, laws, or treaties of the United States.' 28 U.S.C. S 1331.") "Arising under" thus does not have a single "plain meaning" even where used solely in the context of federal court jurisdiction. More importantly, Article III and S 1331, even if they did embody the same concept of "arising under," would not provide an apt analogy to S 1658. Article III and S 1331 primarily distinguish between cases arising under federal law and cases arising under state or foreign law for the purpose of describing judicial jurisdiction. Section 1658 seeks to distinguish between cases arising under certain Acts of Congress from cases arising under other Acts of Congress for the purpose of preserving existing statute of limitations case law. Because of these disparate purposes, we think it doubtful that Congress had the notion of federal ingredient jurisdiction in mind when it enacted S 1658.

it valued the avoidance of frustrated expectations more highly than national uniformity. It realized that there was an existing body of caselaw establishing limitations periods for causes of action arising under federal statutes already in existence, and it decided to preserve that body of law in the interest of avoiding the disruption of parties' settled expectations. See H.R. Rep. No. 101-734,S 111, at 24 (1990) (recognizing that "with respect to many statutes that have no explicit limitations provision, the relevant limitations period has long since been resolved by judicial decision . . . [and that] retroactively imposing a four year statute of limitations . . . would threaten to disrupt the settled expectations of a great many parties."). Congress implemented this decision by stipulating that the new four-year statute of limitations would not be applicable to any "civil action arising under an Act of Congress enacted" before December 1, 1990.

Given the preeminent value placed by Congress on the avoidance of disappointed expectations, we conclude that the choice between the three proposed readings ofS 1658 should be made on the basis of which will provide the greatest certainty in application. Whatever alternative is chosen, some line drawing on a case-by-case basis will be unavoidable, but every effort should be made to minimize the opportunities for debate.

The first alternative is the one urged by Zubi. Atfirst blush, it seems to promise a fair degree of certainty in application. Did the new statute create a cause of action that did not previously exist? If so, S 1658 applies; if not, state law applies. But that promise, upon reflection, seems to us illusory. First, as we have pointed out, Zubi's interpretation results in different statutes of limitations being applied to plaintiffs suing under the same statute depending on the particular facts of their claims. Thus, for example, plaintiffs who invoke S 1981 because they have been victims of discrimination in hiring will have their claims governed by one statute of limitations, while plaintiffs who invoke the same statute because they are victims of a discriminatory discharge will have their claims governed by another. Adoption of such an interpretation would seem to us to generate exactly the kind of confusion and unfairness that Congress sought to avoid.

7

Recognition of two classes of plaintiffs under S 1981, when applied in a state with a statute of limitations for S 1981 claims larger than four years, is likely to result in unsuspecting plaintiffs who have relied on established precedent finding themselves barred from relief. Conversely, recognizing two classes, when applied in a state with a statute for S 1981 claims shorter than four years, is likely to result in defendants finding themselves faced with potential liability on claims they believed extinguished.

More importantly, determining what is a "new" claim, created by an amendment, is a task fraught with uncertainty. Amendments vary in their purpose, and the line between an amendment that modifies an existing right and one that creates a new right is often difficult to draw. This is well illustrated by other amendments effected by the Civil Rights Act of 1991.

Amendments frequently are intended to clarify the law when there has been a difference of opinion regarding the interpretation of an existing statute. In such situations, conflicting views on whether the clarifying amendment created new rights or merely codified the preexisting caselaw are what occasion the amendment. Congress in its deliberations over the Civil Rights Act of 1991, for example, concluded that the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), had suggested that no violation of Title VII occurred when discriminatory animus is a factor in, but not a but-for cause of, an adverse employment action. See H.R. Rep. No. 102-40(I), S 203, at 45 (1991). In response, it adopted an amendment to the Civil Rights Act of 1964 "clarifying" that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Civil Rights Act of 1991, Pub. L. No. 102-166, S 107(a), 105 Stat. 1071, 1076. Adoption of Zubi's interpretation of S 1658 would surely lead to litigation over whether a plaintiff alleging that race was a motivating factor in his discharge asserts a newly-created claim or an old one based on the 1964 Act. See Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995) (discussing the conflicting views

8

of the Price Waterhouse opinions on the nature of the required showing of causal nexus).

Amendments are also frequently designed to ease the plaintiff 's burden of demonstrating a violation of an existing statute by eliminating an element of his prima facie case or providing a way around an affirmative defense. Congress, for example, understood the Supreme Court decision in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), to stand for the proposition that a plaintiff in a disparate-impact case established no violation of Title VII in the absence of an allegation and proof that the challenged employment practice was not a business necessity. See H.R. Rep. No. 102-40(I), SS 201-02, at 23-45 (1991). It also understood Wards Cove to eliminate the preexisting rule that such a plaintiff could prevail, even in the face of a showing of business necessity, by showing an alternative practice with less disparate impact. See id. In response, Congress in 1991 amended the Civil Rights Act of 1964 to stipulate that a violation of Title VII is established with a showing of disparate impact and to restore the alternative-practice theory of recovery. See Civil Rights Act of 1991, Pub. L. No. 102-166, S 105, 105 Stat. 1071, 1074. In each of these situations, there will be plaintiffs situated so that they will be able to recover under the amended statute but would not have been able to do so under the preexisting one. Are plaintiffs who are so situated asserting newly-created claims that did not previously exist so as to come within the scope of S 1658?

Finally, we note that the Civil Rights Act of 1991 also amended Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 to authorize, for the first time, the award of compensatory and punitive damages for intentional discrimination. See Civil Rights Act of 1991, Pub. L. No. 102-166, S 102, 105 Stat. 1071, 1072-74. Is a suit brought solely to recover such damages governed by the federal limitations period on the theory that these amendments created new claims or by the state statutes on the theory that they provide only an additional remedy for an existing cause of action?

These amendments effected by the Civil Rights Act of 1991 illustrate the many categories of amendments that

9

would raise litigable issues under S 1658 if Zubi's interpretation of that section were adopted. Because of the resulting uncertainties of application, we conclude that embracing that interpretation would be inconsistent with Congress' wish to avoid unnecessary uncertainty.

We reach the same conclusion with respect to the second suggested reading of S 1658. Under that reading, application of S 1658 requires differentiating amendments that effect only technical changes from amendments that "substantially alter" the meaning of the preexisting statute, a task that is imprecise at best. Moreover, while this reading avoids the confusion that would be created by claims under the same statutory section being governed by different statutes of limitations, it would be a source of even greater confusion because claims accruing after the amendment would be governed by S 1658 even though the identical claim could have been pursued under the preexisting statute and would have been governed by state law. Thus, even though S 1658 purports on its face to preserve existing limitations law, a claim underS 1981, as amended, for discrimination in hiring would be governed by a different limitations statute than an identicalS 1981 claim that accrued prior to the 1991 amendment. We believe such a result would directly conflict with Congress' express desire to give S 1658 only prospective effect.

It is the third alternative that seems to us to promise the least uncertainty of application. The underlying rationale of that reading is that when Congress amends a preexisting statute it does not create a "new act," and claims arising under the statute as amended continue to arise under the preexisting statute. It is, thus, only when Congress establishes a new cause of action without reference to preexisting law that S 1658 applies. Thus, when determining whether Congress has amended a preexisting statute or created a "new act," how Congress characterizes its own action should be determinative. We conclude that this is the closest thing to a bright line that can be drawn while remaining faithful to the statutory text and its legislative history.

We realize that our approach will not provide an

10

indisputable answer in all situations.6  We believe that it will provide such an answer in the vast majority of situations, however, and clearly it provides such an answer here. As we explained earlier, Congress here chose to build upon a statutory text that has existed since 1870. Accordingly, we hold that Zubi's civil action arises under an Act of Congress enacted before December 1, 1990, and is governed by New Jersey's two year statute of limitations.7

III.

At oral argument in this case, it was suggested that 42 U.S.C. S 1988 specifically provides a statute of limitations for civil rights actions and, therefore, that section 1658, even assuming that Zubi's case arises under the 1991 amendments, is inapplicable. See 28 U.S.C.S 1658 ("Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.") (emphasis added). We instructed the parties to brief the issue, and we now hold that section 1988 does not provide a statute of limitations

_____

6. Congress casts its legislation in a myriad of different ways, and we do not mean to endorse an inflexible standard predicated solely on the terminology utilized by Congress. At times, for example, Congress "amends" "Parts" of the Code by deleting them in their entirety and substituting an entirely different text. We do not suggest that such "amendments" be treated as anything other than a new act of Congress. We believe in most instances potential litigants will be able to identify situations in which Congress is building on a preexisting act and situations in which it is creating a new act.

7. The dissent reads "action" to mean "civil lawsuit," "Act of Congress" to include anything published in the United States Statutes at Large, and "arising under" to mean having "an ingredient" supplied by a post-1991 Act. If "ingredient" here means essential ingredient, then the dissent's approach is the functional equivalent of the "new claim" approach that Zubi urges and is subject to the uncertainties we have discussed. If "ingredient" means something less, then the dissent's approach seems to us likely to result in the four-year limitations period applying to any civil lawsuit containing a claim based on a statute that has been amended in any way after December 1, 1991. We believe that result would be inconsistent with the intent to preserve settled limitations law.

11

for civil actions arising under acts of Congress enacted after December 1, 1990, so as to preclude application of section 1658.

Section 1988 provides that the civil rights laws:

> shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court have jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . .

42 U.S.C. S 1988(a).

Section 1658 specifies a four-year statute of limitations for a class of claims (i.e., those claims arising under statutes enacted after December 1, 1990). It excludes from that class only those claims with respect to which another statute provides a different limitations period. Section 1988 does not provide a specific limitations period for claims that would otherwise be governed by S 1658; it provides only for the borrowing of state rules when there are no federal rules suitable to carry the civil rights laws into effect. Because we see no reason why S 1658 is not suitable to effectuate the civil rights laws with respect to the class of claims to which it applies, S 1988 provides no authority for borrowing a state statute of limitations for such claims.

Indeed, reading S 1988 as one of the exceptions to the scope of S 1658 would produce a result that Congress clearly did not intend. Section 1988 reflects a congressional preference for federal law when it may be appropriately applied. Nothing in S 1658 conflicts with this preference, and as we have indicated, it provides a limitations period that can appropriately be applied. Accordingly, we decline to read these statutory provisions in a way that would result in the application of state limitations law to a claim

12

within the scope of S 1658 (i.e., a claim arising under a federal statute enacted after December 1, 1990).

IV.

For the reasons stated herein, we will affirm the judgment of the District Court.

13

ALITO, Circuit Judge, dissenting:

I disagree with the majority's interpretation of 28 U.S.C. S 1658 and with the result that it reaches in the case before us. The majority does not heed the established meaning of the terms employed in S 1658. Instead, the majority relies on a snippet of legislative history and its own opinion regarding the rule that "seems . . . to promise the least uncertainty of application." Maj. Op. at p. 10. This is not the method that we are supposed to use in interpreting statutes, and it is doubtful that the majority's interpretation will provide the certainty of application that the majority seeks. Accordingly, I respectfully dissent.

I.

Before December 1, 1990, claims under 42 U.S.C.S 1981 were subject to the most analogous state statute of limitations. See Wilson v. Garcia, 471 U.S. 261, 279 (1985). On December 1, 1990, however, the Judicial Improvement Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, became law. Section 313(a) of this Act, which is codified at 28 U.S.C. S 1658, created a new, four-year statute of limitations for "an action arising under an Act of Congress enacted after the date of enactment of this section [December 1, 1990]." Our task here is to construe this language.

As the Supreme Court and our Court have repeated many times, in interpreting a statute, "[w]e begin by looking to the language of the Act. . . . When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." Rubin v. United States, 449 U.S. 424, 429-30 (1981) (internal quotations omitted). See also, e.g., Estate of Cowart v. Niklos Drilling Co., 505 U.S. 469, 475 (1992); Demarest v. Manspeaker, 498 U.S. 184, 190 (1991); Bread Political Action Committee v. FEC, 455 U.S. 577, 580 (1982); In re Unisys Sav. Plan Litig., 74 F.3d 420, 444 (3d Cir. 1996) ("As with any inquiry of statutory construction, we start with the text of the statute," and thus "where Congress' will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.") (internal citations

14

omitted). If a statute uses legal terms of art, we must "presume Congress intended to adopt the term's ordinary legal meaning." Omnipoint Corp. v. Zoning Hearing Bd., 181 F.3d 403, 407 (3d Cir. 1999) (citing McDermitt Intern., Inc. v. Wilander, 498 U.S. 337, 342 (1991)). See also Morissette v. United States, 342 U.S. 246, 263 (1952); Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transported from another legal source, whether the common law or other legislation, it brings its soil with it.").

In order to understand S 1658, we must interpret three terms -- "action," "Act of Congress," and "arising under"-- each of which has a commonly understood legal meaning. The term "action" refers to a civil lawsuit. See Fed. R. Civ. Proc. 3; Black's Law Dictionary 28-29 (7th ed. 1999).

The term "Act of Congress" means a law enacted in one of the ways prescribed by Article I, S 7 of the Constitution. Acts of Congress are published in the United States Statutes at Large, which constitute "legal evidence" of what the law provides. 1 U.S.C. S 112.

The phrase "arising under" is of course familiar in the field of federal jurisdiction. Article III, S 2 of the Constitution provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under the Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." In Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court, speaking through Chief Justice Marshall, interpreted this provision broadly, stating that a claim falls within the federal judicial power if federal law "forms an ingredient of the original cause." Id. at 823. See also Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 27-28 (1982); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491-92 (1983); Gully v. First National Bank in Meridian, 299 U.S. 109, 112 (1936).

Congress employed the phrase "arising under" in 1875 when it enacted the predecessor of current 28 U.S.C.S 1331,8 which gives the district courts subject matter jurisdiction

_____

8. See Act of March 3, 1875, 18 Stat. 470.

15

over causes of action "arising under the Constitution, laws, or treaties of the United States." The Supreme Court has "long construed the statutory grant of federal question jurisdiction as conferring a more limited power" than Article III, S 2. Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 807 (1986). With respect to the statutory provision, the Court has observed:

> The most familiar definition of the statutory"arising under" limitation is Justice Holmes' statement,"A suit arises under the law that creates the cause of action." American Well Works Co. v. Layne & Bowler Co. , 241 U.S. 257, 260 (1916). However, it is well settled that Justice Holmes' test is more useful for describing the vast majority of cases that come within the district courts' original jurisdiction than it is for describing which cases are beyond district court jurisdiction. We have often held that a case "arose under" federal law where the vindication of a right under state law necessarily turned on some construction of federal law, see, e.g., Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921); Hopkins v. Walker, 244 U.S. 486 (1917), and even the most ardent proponent of the Holmes test has admitted that it has been rejected as an exclusionary principle, see Flournoy v. Wiener, 321 U.S. 253, 270-272 (1944) (Frankfurter, J., dissenting). See also T.B. Harms Co. v. Eliscu, 339 F.2d 823, 827 (CA2 1964) (Friendly, J.). Leading commentators have suggested that for purposes of S 1331 an action "arises under" federal law "if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 889 (2d ed. 1973) . . . ; cf. T.B. Harms Co., supra ("a case may `arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law").

Franchise Tax Bd., 463 U.S. at 8-9 (parallel citations to S. Ct. Rep. and L. Ed. omitted).

16

In interpreting the meaning of the phrase "arising under" in 28 U.S.C. S 1658, we must presume that Congress had in mind the well known interpretations of the same phrase in Article III, S 2 of the Constitution and/or the federal question statute.

II.

With these interpretations of the relevant statutory terms in mind, I turn to the particular claim at issue in this case. In September 1995, Madhat Zubi was terminated from his job at AT&T. On July 30, 1998, he commenced an action in federal court in New Jersey, claiming that he was discharged because of his race, in violation of 42 U.S.C. S 1981.

Title 42 United States Code S1981, in its current form, provides as follows:

> (a) Statement of equal rights
>
>  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
>  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
>  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

This provision is not itself an Act of Congress; rather, it is a codification of two prior Acts.[9]  Subsection (a) of S 1981
_____

9. Thus, it is not itself the law but only "prima facie" evidence of the law,
1 U.S.C. S 204 (a). See United States National Bank of Oregon v.

is a codification of Section 1977 of the Revised Statutes of 1874.10 Until 1989, it was unsettled whether the phrase "make and enforce contracts" in this provision reached the discriminatory termination of a contractual relationship, but in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Supreme Court held that this language did not apply to conduct occurring after the formation of a contract. "[T]he Patterson opinionfinally decided what S 1981 had always meant." Rivers v. Roadway Express, 511 U.S. 288, 313 n.12 (1994).

In 1991, shortly after enacting 28 U.S.C. S 1658, Congress broadened the scope of this provision. Section 101 of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, amended Section 1977 of the Revised Statutes and defined the phrase "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." This new provision is codified as 42 U.S.C. S 1981(b). Thus, as a result of the 1991 Act, a plaintiff may now sue under S 1981 for discriminatory

_____

Independent Insurance Agents of America, Inc., 508 U.S. 439, 449 & n.4 (1993).

10. Subsection (a) may be traced to Section 16 of the Civil Rights Act of 1870, Act of May 31, 1870, ch. 114, S 16, 16 Stat. 144, and Section 1 of the Civil Rights Act of 1866, Act of 1866, 14 Stat. 27. In 1874, however, Congress enacted into law the Revised Statutes of 1874, "a massive revision, reorganization, and reenactment of all statutes in effect at the time, accompanied by a simultaneous repeal of all prior ones." United States National Bank of Oregon, 508 U.S. at 449. The relevant sections of the Civil Rights Acts of 1866 and 1870 were thus repealed and then re-enacted as section 1977 of the Revised Statutes of 1874. See Runyon v. McCrary, 427 U.S. 160, 168 n.8 (1976).

When the U.S. Code was compiled, the provisions of Rev. Stat S 1977 were codified at 42 U.S.C. S 1981. In 1991, when Rev. Stat S 1977 was amended, the amendments were also, of course, reflected in 42 U.S.C. S 1981. Section 1981 of the United States Code has never itself been enacted as positive law, though, and it is thus only"prima facie" evidence of the provisions of Rev. Stat. S 1977 as amended by the Civil Rights Act of 1991. See 1 U.S.C. S 204 (a). Cf. United States National Bank of Oregon v. Independent Insurance Agents of America, Inc., 508 U.S. 439, 448-449 & n.4 (1993).

18

termination of employment -- and that is precisely what Zubi did here.

Zubi filed his complaint more than two years, but less than four years, after his claim accrued. If his complaint is governed by S 1658, it was filed within the statute of limitations. On the other hand, if it is not governed by S 1658, it is subject to the most analogous New Jersey statute of limitations, which the District Court found to be New Jersey's two-year statute for personal injury actions. See Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991)(two-year statute applies to S 1983 actions in New Jersey). In my view, Zubi's claim arose under the Civil Rights Act of 1991, as well as under Section 1977 of the Revised Statutes, and his complaint was thus filed in time.

It is beyond dispute that the Civil Rights Act of 1991 qualifies as an "Act of Congress" in the sense in which that term is invariably used. We would have to interpret the term "Act of Congress" in S 1658 in an entirely idiosyncratic way in order to reach a contrary conclusion. It is also clear that Zubi's claim of discriminatory termination arose under Section 101 of that Act under any of the accepted interpretations of the phrase "arising under." As noted, Section 101 of the Civil Rights Act of 1991 substantially expanded the scope of S 1981 by prospectively defining the phrase "make and enforce contracts" to include the termination of contracts. This new definition was indisputably an "ingredient" of Zubi's claim. American Well Works Co., 241 U.S. at 260. Indeed, it was an indispensable ingredient. For this same reason, in any realistic sense, Section 101 of the 1991 Act "create[d] the cause of action" for racially discriminatory termination of employment that Zubi asserted. American Well Works Co., 241 U.S. at 260. Furthermore, "in order for [Zubi] to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of [the proposition, established by the 1991 Act, that a plaintiff may sue under S 1981 for racially discriminatory termination of employment]." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 889 (2d ed. 1973). Consequently, I would hold that Zubi's claim is governed by the four-year statute of 28 U.S.C.S 1658 and was not properly dismissed.

III.

I now turn to the majority's interpretation of the statute. The majority pays little attention to the language of S 1658. Instead, after noting that district courts have adopted a variety of interpretations of this provision, the majority quickly concludes that the statute is ambiguous. See Maj. Op. at p. 4-6. The majority then lists three "distinct approaches" contained in these district court decisions, Maj. Op. at p. 4-5, and selects from among them based on what it finds to be "the rationale behind S 1658," which it identifies, based on a snippet of legislative history, to be the avoidance of disruptions of " `the settled expectations of a great many parties.' " Maj. Op. at p. 7 (quoting H.R. Rep. No. 101-734, S 111, at 24 (1990)), reprinted in 1990 U.S.C.A.N. at 6870. This analysis leads the majority to the conclusion that it is "only when Congress establishes a new cause of action without reference to preexisting law that S 1658 applies." Maj. Op. at p. 10. According to the majority, an Act of Congress that amends a prior Act (generally) does not qualify as an Act of Congress within the meaning of S 1658, see Maj. Op. at footnote 5, p. 6.11

This interpretation cannot be squared with the language of S 1658, which, as noted, states that a four-year statute of limitations applies to "an action arising under an Act of Congress enacted after [December 1, 1990]." Under the majority's reading, however, the four-year statute is restricted to actions arising under some Acts of Congress enacted after December 1, 1990 -- namely those Acts of Congress that "establish[ ] a new cause of action without reference to preexisting law." According to the majority, an Act of Congress that establishes a new cause of action but refers to "preexisting law" in doing so does not qualify as "an Act of Congress" within the meaning ofS 1658. This interpretation of the term "Act of Congress" is not consistent with any known usage of the term.

_____

11. This approach seems to have been inspired by a recent article. See, Boyd A. Byers, "Adventures in Topsy-Turvy Land: Are Civil Rights Claims Arising Under 42 U.S.C. S 1981 Governed by the Federal Four-Year "Catch-All" Statute of Limitations, 28 U.S.C.S 1658?, 38 Washburn L.J. 509 (1999).

20

In defense of its interpretation, the majority cites the previously mentioned statement in the legislative history to the effect that Congress did not want to disturb"the settled expectations of a great many parties." This very general sentiment, however, does not support the interpretation of S 1658 that the majority adopts––as the current case illustrates. Before the enactment of the Civil Rights Act of 1991, no employer in New Jersey could have had a settled expectation that an action for discriminatory discharge brought under S1981 would be subject to the state's two year statute of limitations for personal injury actions, since prior to that time, S 1981 did not authorize such an action at all. It was not until the 1991 Act that such an action was possible, and by that point S 1658 had been enacted. In light of the clarity of the language of S 1658, when interpreted in accordance with standard canons of construction, it is not apparent that resort to the legislative history is appropriate. See Darby v. Cisneros , 509 U.S. 137, 147, (1993) ("Recourse to the legislative history. . . is unnecessary in light of the plain meaning of the statutory text."). But even if the legislative history is considered, the single, general statement cited by the majority cannot bear the weight of the majority's interpretation.

The principal basis for that interpretation, it appears, is the majority's belief that its interpretation "promise[s] the least uncertainty of application" and is "the closest thing to a bright line." Maj. Op. at p. 10. In interpreting a statute, however, we are not free to disregard Congress's approach in favor of one that seems better to us. "It is by now axiomatic that `the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.' Absent ambiguity in the statute, we cannot allow policy to guide our analysis." Sea–Land Serv., Inc. v. Barry, 41 F.3d 903, 909 (3d Cir. 1994) (internal citations omitted) (quoting City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976)); see also, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 748 (1975). In framing S 1658, Congress plainly passed up alternative, simpler approaches. To take just one example that is much simpler than either S 1658 itself or the majority's rule, Congress could have made the new,

21

four-year statute applicable to any claim accruing after December 1, 1990. Such an approach definitely would have provided a very "bright line rule," but Congress obviously thought that interests other than clarity and ease of application also had to be served to at least some degree.

Finally, I note that the majority's interpretation may not provide the clarity and certainty of application that the majority seeks. Under the majority's approach, most Acts of Congress that amend prior Acts of Congress do not qualify as Acts of Congress under S 1658. In footnote 5, however, the majority says that not all enactments styled as amendments are real amendments, and thus some amendments may count as Acts of Congress under S 1658. See Maj. Op., footnote 5. The majority may regard this as "the closest thing to a bright line rule." I do not.

I would hold that Zubi's claim is governed by the four-year statute of S 1658, and I would therefore reverse and remand.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit