**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 15-1478**

—————

24TH SENATORIAL DISTRICT REPUBLICAN COMMITTEE;
KENNETH H. ADAMS, individually and as Chairman of the
24th Senatorial District Republican Committee,

        Plaintiffs - Appellants,

    and

DANIEL MOXLEY,

        Intervenor/Plaintiff,

    v.

JAMES B. ALCORN, in his official capacity as Chairman of the
Virginia State Board of Elections; CLARA BELLE WHEELER, in
her official capacity as Vice-Chairman of the Virginia State
Board of Elections; SINGLETON B. MCALLISTER, in her official
capacity as Secretary of the Virginia State Board of
Elections; VIRGINIA DEPARTMENT OF ELECTIONS;
EMMETT W. HANGER, JR.,

        Defendants - Appellees.

-------------------------------------

REPUBLICAN PARTY OF VIRGINIA, INC.,

        Amicus Supporting Appellants.

—————

**No. 15-1483**

—————

DANIEL MOXLEY,

        Intervenor/Plaintiff – Appellant,

24TH SENATORIAL DISTRICT REPUBLICAN COMMITTEE; KENNETH H. ADAMS, individually and as Chairman of the 24th Senatorial District Republican Committee,

                    Plaintiffs,

          v.

JAMES B. ALCORN, in his official capacity as Chairman of the Virginia State Board of Elections; CLARA BELLE WHEELER, in her official capacity as Vice-Chairman of the Virginia State Board of Elections; SINGLETON B. MCALLISTER, in her official capacity as Secretary of the Virginia State Board of Elections; VIRGINIA DEPARTMENT OF ELECTIONS; EMMETT W. HANGER, JR.,

                    Defendants - Appellees.

-------------------------------------

REPUBLICAN PARTY OF VIRGINIA, INC.,

          Amicus Supporting Appellant.

---

Appeals from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth K. Dillon, District Judge. (5:15-cv-00012-EKD)

---

Argued:  December 9, 2015                 Decided:  April 19, 2016

---

Before TRAXLER, Chief Judge, and GREGORY and DIAZ, Circuit Judges.

---

Affirmed by published opinion.  Judge Gregory wrote the majority opinion, in which Judge Diaz joined.  Chief Judge Traxler wrote a dissenting opinion.

---

**ARGUED:** Jeffrey R. Adams, WHARTON, ALDHIZER & WEAVER, PLC, Harrisonburg, Virginia, for Appellants.  Joshua D. Heslinga, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  Richard Dean Boyer, BOYER LAW FIRM, PLLC, Lynchburg, Virginia, for Intervenor. **ON BRIEF:** Thomas E. Ullrich, WHARTON, ALDHIZER & WEAVER, PLC, Staunton,

Virginia; John C. Wirth, NELSON, MCPHERSON, SUMMERS & SANTOS, L.C., Staunton, Virginia, for Appellants. Mark R. Herring, Attorney General of Virginia, Cynthia E. Hudson, Chief Deputy Attorney General, John W. Daniel II, Deputy Attorney General, Kristina Perry Stoney, Senior Assistant Attorney General, Anna T. Birkenheier, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees Alcorn, Wheeler, McAllister, and the Virginia Department of Elections; Chris Ashby, ASHBY LAW PLLC, Alexandria, Virginia, for Appellee Emmett W. Hanger, Jr. Patrick M. McSweeney, MCSWEENEY, CYNKAR & KACHOUROFF, PLLC, Powhatan, Virginia, for Amicus Curiae.

---

GREGORY, Circuit Judge:

The 24th Senatorial District Republican Committee of Virginia and Committee Chairman Kenneth H. Adams (together, the "Committee"), and Plaintiff-Intervenor Daniel Moxley, appeal the district court's dismissal of their complaints for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). For the following reasons, we conclude that the district court correctly dismissed the plaintiffs' and plaintiff-intervenor's complaints and therefore affirm.

I.

A.

Under Virginia law, political parties generally "have the right to determine the method by which a party nomination for a member of . . . any statewide office shall be made." Va. Code Ann. § 24.2-509(A). "Notwithstanding" this general rule, the Incumbent Protection Act (the "Act") provides that "[a] party shall nominate its candidate for election for a General Assembly district where there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party." Va. Code Ann. § 24.2-509(B) (emphasis added).

The Republican Party of Virginia (the "Party") is governed pursuant to its Plan of Organization (the "Plan"), which the

4

Committee acknowledges "is the Party's definitive statement on any matter it addresses." Pls.' Mem. Supp. Mot. Prelim. Inj. at 3. According to the Plan, Legislative District Committees ("LDCs") are unincorporated associations designated pursuant to the Plan that "determine whether candidates for Legislative District public office shall be nominated by Mass Meeting, Party Canvass, Convention or Primary, where permitted to do so under Virginia Law." J.A. 163. The Committee is the LDC responsible for determining the method of nomination for candidates seeking the Republican nomination for the 24th Senatorial District for the Virginia General Assembly.

In December 2014, the Committee exercised its authority under the Plan and adopted a resolution designating a convention as the method of nominating the Republican candidate for the 24th Senate District seat in the 2015 election. On February 23, 2015, incumbent state senator Emmett Hanger relied on the authority granted to him by the Act and designated a primary as the method of nomination.

B.

The Committee filed this suit pursuant to 42 U.S.C. §§ 1983 and 1988 against the members of the Virginia State Board of Elections and the Virginia Department of Elections (together, the "Commonwealth") seeking declaratory and injunctive relief. The Committee's complaint alleges that the Act infringes on its

5

First Amendment right to freedom of association by preventing it from determining the method of nomination in contravention of the terms of the Plan.[1]

Senator Hanger and Moxley, who sought the Party's nomination for Senator Hanger's seat on the 24th District, both moved to intervene. Moxley alleged that the Act violates his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment because it confers on an incumbent an electoral advantage and invidiously discriminates against him and all other potential challengers to Hanger.

Plaintiffs filed a motion for preliminary injunction seeking to enjoin the Commonwealth from implementing a primary. Three days before a scheduled hearing on the preliminary injunction, the defendants filed a motion to dismiss, arguing that the Committee failed to establish standing because the Plan expressly incorporates Virginia law into its delegation of authority to the LDC.

At the outset of the motion hearing, the district court asked counsel whether there were any "issues of disputed fact." J.A. 203. Counsel for the Committee responded, "We believe we

---

[1] Although the Committee argues here that it also raises an equal protection challenge, it did not plead a claim under the Equal Protection Clause in the district court. Because this issue is raised for the first time on appeal, we decline to address it. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993).

6

do not." The district court heard from both sides on the standing issue and the proper interpretation of the Plan. See J.A. 213-229.

The district court subsequently granted the defendants' motions to dismiss, holding that the plaintiffs failed to meet their burden to establish standing, and denying the remaining pending motions as moot, including the motions for preliminary injunction.

II.

On appeal, the plaintiffs argue that the district court erred by dismissing the complaint for lack of subject matter jurisdiction. We review the district court's dismissal for lack of standing de novo. Lee Graham Shopping Center, LLC v. Estate of Kirsch, 777 F.3d 678, 680 (4th Cir. 2015).

To have standing, a plaintiff must demonstrate (1) "he has suffered an actual or threatened injury," (2) "a causal connection between the injury complained of and the challenged action," and (3) "the injury can be redressed by a favorable decision." Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555,

7

560 (1992) (internal quotation marks omitted). The plaintiffs have the burden of alleging sufficient facts to demonstrate standing. Marshall, 105 F.3d at 906 (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)).

III.

Before we turn to the language of the Plan itself, we address the Committee's argument that the construction of the Plan is a jurisdictional fact intertwined with the facts central to the merits of the dispute and that dismissal under Federal Rule of Civil Procedure 12(b)(1) prior to allowing discovery was premature. In the alternative, the Committee argues that the evidence was insufficient to dismiss at the 12(b)(1) stage, particularly because the proper construction of the Plan was a contested fact. The Committee concedes that it waived a hearing on the motions to dismiss, but nevertheless insists that the district court failed to develop sufficient facts to resolve the jurisdictional issue.

"[A] defendant may challenge subject matter jurisdiction in one of two ways." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). "First, the defendant may contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." Id. (citing Adams, 697 F.2d at

8

1219). Alternatively, the defendant may contend "that the jurisdictional allegations of the complaint were not true." Adams, 697 F.2d at 1219. In the second scenario, "[a] trial court may then go beyond the allegations of the complaint" and hold an evidentiary hearing to "determine if there are facts to support the jurisdictional allegations." Id. There is no presumption of truth and the court weighs the evidence presented in a 12(b)(1) hearing to determine jurisdiction. Id. "If, however, the jurisdictional facts are intertwined with the facts central to the merits of the complaint, 'a presumption of truthfulness should attach to the plaintiff's allegations.'" Rich v. United States, 811 F.3d 140, 145 (4th Cir. 2015) (citing Kerns, 585 F.3d at 193). And "the court should resolve the relevant factual disputes only after appropriate discovery." Id. (citation omitted).

The Committee relies primarily on our decision in Kerns for its argument that dismissal at the pleading stage was premature. However, we have said that the "controlling jurisdictional fact in Kerns—whether an employee was acting within the scope of her employment for purposes of the Federal Tort Claims Act—has no analog" where the issue before the court is "purely a legal question that can be readily resolved in the absence of discovery." Blitz v. Napolitano, 700 F.3d 733, 739 (4th Cir. 2012). In Blitz, we analyzed whether the Transportation

9

Security Administration's standard operating procedures for checkpoint screening constituted an "order" under 49 U.S.C. § 46110. Id. at 735. The district court had decided the question, and granted defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), without reviewing the written procedures themselves and without an administrative record before it. Id. at 738. We decided that because an extensive administrative record had been filed in a similar case before the D.C. Circuit, and that such a record would be submitted if Plaintiffs filed their petition in the appropriate court, the record before the district court was sufficient to answer the jurisdictional question. Id. at 739.

Like Blitz, we find that the record before the district court in this case was sufficient to decide the jurisdictional question. Not only did the record contain the complete Party Plan, the district court undertook a thorough and exacting review of it. See J.A. 363-69.

Moreover, the Committee and the Commonwealth both clearly represented to the district court that there were no issues of disputed fact. J.A. 203. The Committee now contends that its "factual stipulation" was "limited" to the motion for preliminary injunction. There is no evidence from the transcript that the Committee's stipulation was indeed limited

10

in this way and no argument presented for what the legal significance of such a limitation might be.

The Committee also fails to present a compelling argument as to what evidence additional discovery would have brought to light. When asked by the district court whether there was "any evidence [they could] provide . . . as to why that particular phrase is in that part of the plan and not in other portions of the plan," counsel for the Committee replied: "Not any evidence, no." J.A. 223. The Committee's insistence that discovery was necessary is particularly puzzling given the fact that no one sought or mentioned discovery at the hearing or in the briefs they submitted after the hearing. See J.A. 312.

Finally, the district court's singular use of the phrase "more reasonable" to describe the Committee's construction of the Plan in its opinion does not in and of itself transform what is essentially a legal question into a factual one. "The interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue." Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). Because the proper construction of the Plan is a question of law and the record before the district court was sufficient, we conclude that jurisdictional discovery was not necessary.

IV.

Whether the Committee has standing depends on whether its alleged injury was the result of the Act or a lawful and voluntary decision on behalf of the Party. The Commonwealth argues that the Party has limited its authority to determine unilaterally the method of nomination through its adoption of Article V Section D(1)(a) of the Party Plan, which reads, "The Legislative District Committee shall determine whether candidates for Legislative District public office shall be nominated by Mass Meeting, Party Canvass, Convention or Primary, where permitted to do so under Virginia Law." J.A. 163 (emphasis added). We agree.

A.

We have previously held that where an "alleged injury is caused by a voluntary choice made by the Virginia Republican Party and not [the challenged state law]," plaintiffs do not establish causation. Marshall, 105 F.3d at 906. In Marshall, two members of the Party challenged Virginia's open-primary law, which allows primary voting for all individuals qualified to vote regardless of party affiliation, alleging that it burdened their rights to free speech and freedom of association. Id. at 905 (citing Va. Code Ann. § 24.2-530). Then-incumbent U.S. senator John Warner exercised his power under the Act and

12

selected a primary as the means of nomination for his seat.  Id.
Several months later, the Party also adopted a primary.  Id.

The district court dismissed the suit for lack of subject matter jurisdiction, and we affirmed, concluding that the plaintiffs failed to satisfy the causation and redressability components of the standing inquiry.  Id. at 905-07.  We found that it was the Party's decision to conduct an open primary, rather than the open primary law itself, that was the cause of plaintiffs' alleged injury because (1) it was not unconstitutional for a political party to choose an "open" primary and (2) there was "no indication" that the Party "would have a 'closed' primary in the absence of the Open Primary Law or change to a 'closed' primary if we declared the Open Primary Law unconstitutional."  Id. at 906.  "In other words, if a political party's choice of an 'open' primary is a lawful and voluntary one, the decision of the party is the cause of the alleged 'forced' association, not the state law requiring the 'open' primary."  Id. at 906 (citing Marchioro v. Chaney, 442 U.S. 191, 199 (1979) ("There can be no complaint that the party's right to govern itself has been substantially burdened by statute when the source of the complaint is the party's own decision.")).

13

B.

We now turn to the construction of the Plan to determine whether the Party voluntarily submitted to the Act and incorporated it by reference into the Plan.

"The constitution and by-laws adopted by a voluntary association constitutes a contract between the members, which, if not immoral or contrary to public policy, or the law, will be enforced by the courts." Gottlieb v. Econ. Stores, Inc., 102 S.E.2d 345, 351 (Va. 1958) (citation omitted). Therefore, we interpret the Plan according to general principles of contract interpretation under Virginia law.

In Virginia, "courts adhere to the 'plain meaning' rule in interpreting and enforcing a contract." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999). If the contract "is complete on its face" and "plain and unambiguous in its terms," we do not "search for its meaning beyond the instrument itself." Id. Furthermore, we "read the contract as a single document and give meaning to every clause where possible . . . giv[ing] effect to the presumption that the parties have not used words aimlessly." Id. (citations omitted.)

Whether the Party voluntarily submitted to the Act turns on the meaning of the clause "where permitted to do so under Virginia Law." This phrase does not appear anywhere else in the

14

Plan, despite the fact that there are similar delegations in three other parts of the Plan's text. For example, article III, section D(1)(b) provides that "[the State Central Committee] shall determine whether candidates for statewide public office shall be nominated by Convention, Party Canvass or Primary." Similarly, article IV, section D(1)(a) specifies that "The [Congressional] District Committee shall determine whether candidates for District public office shall be nominated by Convention, Party Canvass or Primary." See also art. III § D(1)(a) ("The Unit Committee shall determine whether candidates for local and constitutional public offices shall be nominated by Mass Meeting, Party Canvass, Convention, or Primary and whether Unit Chairman and Committee members shall be elected by Mass Meeting, Party Canvass, Convention, or Primary."). When asked at the hearing if the Committee had "any evidence . . . as to why that particular phrase is in that part of the plan and not in any other portions of the plan," counsel for the Committee answered, "Not any evidence, no." J.A. 223. The Plan's omission of the relevant language in three near-verbatim parallel provisions reflects a deliberate choice to provide a limited delegation of authority to the LDCs. See Smith Barney, Inc. v. Critical Health Sys., 212 F.3d 858, 861 (4th Cir. 2000) (relying on the principle of expressio unius est exclusio alterius to interpret contract clause).

15

Furthermore, the fact that the Plan defines "primary" as "subject to the Election Laws of the Commonwealth of Virginia, except to the extent that any provisions of such laws conflict with this Plan, infringe the right to freedom of association, or are otherwise invalid" indicates that the Party was well aware of how to draft language that supported a constitutional challenge to Virginia law. J.A. 23 (Plan at Art. II, ¶ 24) (emphasis added). A faithful reading of the contract that "gives effect to the presumption that the [Party has] not used words aimlessly" requires us to view these selective omissions and inclusions as intentional and meaningful. Hitachi, 166 F.3d at 624. If the Party had intended to preserve its ability to unilaterally choose the method of nomination for legislative districts, it could have done so. Similarly, if it had intended to give the Committee the authority to challenge a provision of Virginia law, it could have done so. The plain language of the contract, read as a single document, shows clearly that it did not.

The Committee contends that the language is more naturally read as "an acknowledgment of the potential for conflict between the Act and the Plan . . . and a statement that the outer limits of an LDC's authority to select the method of nomination are defined by the coercive force of Virginia law." To the extent this differs from the Commonwealth's interpretation, it

16

certainly does not conflict with it, unless we read in nonexistent language. And that is precisely what the Committee would have us do—read the phrase "Virginia law" as "valid, constitutional Virginia law" and assume that the Act is unconstitutional.[2] In interpreting a contract under Virginia law, however, we "cannot read in[] . . . language which will add to or take away from the meaning of the words already contained therein." Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984). The Committee's tortured reading contravenes the plain language of the Plan and requires us to assume the outcome of the very challenge before us.

---

[2] The dissent relies on DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 469 (2015), to support the proposition that "the phrase 'Virginia Law' in the Plan . . . cannot be construed to include invalid Virginia statutes." Dissenting op. at 12. DIRECTV concerned the interpretation of the phrase "law of your state" in a customer service agreement arbitration clause. DIRECTV, 136 S. Ct. at 466. The California Court of Appeals had interpreted "law of your state" to include California law it conceded was invalidated by the Supreme Court's decision in AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011). Id. at 467. The Supreme Court reversed, holding that the California Court of Appeal's interpretation did "not place arbitration contracts 'on equal footing with all other contracts,'" did "not give 'due regard . . . to the federal policy favoring arbitration,'" and therefore was "pre-empted by the Federal Arbitration Act." Id. at 471. DIRECTV is of no import here because no state or federal court has held that Virginia's Incumbent Protection Act is unconstitutional or preempted by federal law. Thus, even if we did construe "'Virginia law' to encompass only valid Virginia law," as the dissent suggests, the Incumbent Protection Act, unlike California's pre-Concepcion state law, has never been invalidated by statute or this, or any other, Court.

The Committee's attempts to distinguish the facts of Marshall are similarly unavailing. As we explained above, disagreement over the Plan's meaning does not transform this legal dispute over contract interpretation into a factual one. Moreover, our holding in Marshall was clear: where the alleged injury is caused by the Party's voluntary choice, the Party does not establish causation. 105 F.3d at 906. The injury in both cases is traceable to the Party's voluntary choice: in Marshall, the choice was to hold an open primary. Id. Here, the choice was to defer to the incumbent's selected nomination method by limiting the authority of the LDC. Whatever factual distinctions may exist do not render inapplicable the analysis and holding of Marshall.

Finally, the Committee's suggestion that the district court erred by failing to secure a definitive interpretation of the Plan from the Party is untimely and therefore waived, as any request should have been made to the district court. Helton v. AT&T, Inc., 709 F.3d 343, 360 (4th Cir. 2013) (citing Muth v. United States, 1 F.3d at 250 (4th Cir. 1993)).

We conclude that the language of the Plan is clear and unambiguous: the Plan delegates to the Committee the authority to determine the nomination method unless Virginia law otherwise limits that authority. Where Virginia law sets forth an alternative method of nomination, the Plan does not give the

18

Committee the authority to supersede or challenge that determination. Because the Party has made a voluntary choice to limit the Committee's authority in this way, the plaintiffs have "no complaint that the party's right to govern itself has been substantially burdened by" the Act because "the source of the complaint is the party's own decision." Marshall, 105 F.3d at 906 (citing Marchioro, 442 U.S. at 199). Accordingly, we affirm the district court's holding that the Committee lacks standing to bring this suit.

V.

Lastly, we address Moxley's claim that he has standing independent of the Party to bring his equal protection claim.

Under Virginia law, there are two entities that have the right to determine the nomination method: political parties and incumbents. Moxley is a member of the Party and, as a member, he is contractually bound by the Plan's rules and decisions. See Gottlieb v. Econ. Stores, Inc., 102 S.E.2d 345, 351 (Va. 1958) ("The constitution and by-laws adopted by a voluntary association constitutes a contract between the members, which, if not immoral or contrary to public policy, or the law, will be enforced by the courts." (citation omitted)). The Plan does not authorize individual party officials or members to determine the nomination method for legislative districts. Moxley seems to

19

recognize this, as he acknowledges that if the Committee had chosen a primary, he would have been "uninjured" because he has "no legal claim to any other method of nomination." J.A. 344.

Because neither Virginia law nor the Plan gives Moxley "a legally protected interest" in determining the nomination method in the first place, he fails to make out "an <u>invasion</u> of a legally protected interest," i.e. actual injury, in this case. <u>Lujan</u>, 504 U.S. at 560 (emphasis added); <u>see, e.g.</u>, <u>Friends for Ferrell Parkway, LLC v. Stasko</u>, 282 F.3d 315, 321 (4th Cir. 2002) (observing that land transaction which would prevent development of land previously designated as a roadway did not impact plaintiffs' "liberty interest in access to their community" because "under Virginia law they have no entitlement to the construction of a roadway").

The dissent relies on out of circuit authority to support its view that Moxley's alleged interest in depriving his opponent the ability to choose "the nominating method that would best ensure his re-nomination" is sufficient to establish his own independent standing. Dissenting op. at 4 (citing <u>Texas Democratic Party v. Benkiser</u>, 459 F.3d 582, 585-87 & n.4 (5th Cir. 2006); <u>Schulz v. Williams</u>, 44 F.3d 48, 53 (2d Cir. 1994); <u>Owen v. Mulligan</u>, 640 F.2d 1130, 1132-33 (9th Cir. 1981)). But even if we assume Moxley has a legally protected interest, he still fails to demonstrate how that injury is redressable by a

20

decision of this Court. In <u>Benkiser</u>, for example, the Fifth Circuit found that plaintiff political party's "threatened loss of political power . . . likely would be redressed by a favorable decision, which would <u>preclude</u> a Republican party candidate." <u>Benkiser</u>, 459 F.3d at 587 (emphasis added). Here, however, the plain language of the Plan indicates that <u>only</u> the LDC shall determine the method of nomination and <u>only where</u> the application of Virginia law does not limit that authority. Even in the absence of the Act, Moxley is bound by the LDC's choice of nomination method. Accordingly, even if the Act were held unconstitutional, the Party is not precluded from "voluntarily elect[ing]" to defer to the incumbent's choice, "which it is legally entitled to do." <u>Marshall</u>, 105 F.3d at 907. And "there is nothing [we] can do to prevent" the Party from deferring to the incumbent's choice. <u>Id.</u>

## VI.

We must apply the plain language of the contract. For the foregoing reasons, the decision of the district court is

<u>AFFIRMED</u>.

21

TRAXLER, Chief Judge, dissenting:

The majority affirms the dismissal of this case for lack of standing because it believes the contractual term "Virginia Law" includes Virginia statutes that are void for unconstitutionality. Because I believe that the phrase plainly does not encompass Virginia statutes that are invalid, and because the Supreme Court has construed nearly identical language to mean valid state law, I respectfully dissent.

I.

Virginia Code § 24.2-509(A) provides that "[t]he duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made."[1] This lawsuit involves constitutional challenges to a statutory exception to that rule that can deprive the political parties of the right to choose the nomination method for candidates for the Virginia General Assembly. That exception, commonly referred to as the Incumbent Protection Act ("the Act"), states in pertinent part, "Notwithstanding Section A, . . . [a] party shall nominate its candidate for election for a General Assembly district where

---

[1] Section 24.2-509(A) also includes similar language concerning the nomination of candidates for the United States Senate or for any statewide office.

22

there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party."  Va. Code § 24.2-509(B).

Central to this appeal is the Plan of Organization (the "Plan") of the Republican Party of Virginia (the "Party"), which is a contract governing the Party's members and operation.  The 24th Senatorial District Republican Committee and its chairman (collectively, the "Committee") brought this action in federal district court against the Virginia Department of Elections and various officials with the Virginia State Board of Elections (collectively, "the Defendants"), claiming that the Act violated its First Amendment right to free association by denying the Committee its right under the terms of the Plan to decide the nomination method for candidates seeking the Republican nomination for the Virginia General Assembly in its district. (The Committee attached the Plan as an exhibit to its complaint.)  Senator Emmett Hanger, the incumbent, and Daniel Moxley, a Republican challenger, later intervened in the suit. Moxley asserted a claim alleging that the Act violated his Fourteenth Amendment right to equal protection under the law by

23

allowing the incumbent Hanger to choose the nomination method.[2] The district court eventually dismissed the entire case for lack of standing.  See Adams v. Alcorn, No. 5:15cv00012, 2015 WL 1524481 (W.D. Va. Apr. 2, 2015).  The Committee and Moxley have appealed.

We review de novo a district court order dismissing for lack of standing.  See Cooksey v. Futrell, 721 F.3d 226, 234 (4th Cir. 2013).  On review of a dismissal of a complaint, we "assume all well-pled facts to be true" and "draw all reasonable inferences in favor of the plaintiff."  Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009) (alteration & internal quotation marks omitted).  We also "consider exhibits attached to the complaint."  Cooksey, 721 F.3d at 234 (internal quotation marks omitted).

Plaintiffs have "the burden of establishing standing" in order to show that a district court possesses subject-matter jurisdiction over a case.  Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006).  The doctrine of constitutional standing includes three components:  "(1) the plaintiff must allege that he or she suffered an actual or threatened injury that is not conjectural or hypothetical[;] (2) the injury must be fairly

---

[2] Senator Hanger chose a primary, whereas the Committee favored a convention.

24

traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury."  Id.

A.

The injury the Committee alleges here is the deprivation of the right to choose the nomination method for the General Assembly position at issue.  And the injury Intervenor Moxley alleges is that his opponent was given the unfair advantage of being allowed to choose the nominating method that would best ensure his re-nomination.[3]  Among other relief, the parties'

---

[3] Moxley's alleged interest in depriving his opponent of that advantage, and thereby increasing his own prospects for winning the nomination, is sufficient to establish his standing. See Texas Democratic Party v. Benkiser, 459 F.3d 582, 586-87 & n.4 (5th Cir. 2006) (holding that plaintiff political party had standing to sue to prevent opposing party from removing a candidate from the ballot and replacing him with a new candidate in part because obtaining that relief would improve the chance of winning for the party's candidate); Schulz v. Williams, 44 F.3d 48, 53 (2d Cir. 1994) (holding, based on "[t]he well-established concept of competitors' standing," that political party chairman had standing to challenge placement of another party's gubernatorial candidate on the ballot because that placement could reduce the chances that the plaintiff's party would receive the number of votes it needed to retain its place on the ballot); Owen v. Mulligan, 640 F.2d 1130, 1132-33 (9th Cir. 1981) (holding that candidate had standing to sue to compel Postal Service to cancel a bulk-mail permit being used by a political opponent to mail political literature insofar as the reduced-cost mailings put the plaintiff candidate at a competitive disadvantage).  Cf. Bostic v. Schaefer, 760 F.3d 352, 371 (4th Cir. 2014) ("[W]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, the injury in fact is the denial of equal treatment resulting from the imposition of the barrier." (alterations & internal quotation marks omitted)).

25

complaints each request a declaration that the Act violates the United States Constitution. The district court concluded that the constitutionality of the Act was irrelevant because the district court believed the Act was not the cause of these alleged injuries and the requested declaratory relief would do nothing to redress the alleged injuries in any event. See Adams, 2015 WL 1524481, at *7; see also id. at *4. That is so, the district court reasoned, because the Party chose to incorporate the Act's terms into its Plan, whether the Act was constitutional or not; thus, it was the Plan, and not the Act, that was the cause in fact of the alleged injuries. See id.; Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997) ("Because the alleged injury is caused by a voluntary choice made by the Virginia Republican Party and not the Open Primary Law, the plaintiffs have not established causation."). It is the correctness of this reading of the Plan that is at the heart of the case before us.

The parties agree that the Plan should be interpreted as a contract among the members of the Republican Party of Virginia ("the Party") and construed according to ordinary contract principles. See Gottlieb v. Economy Stores, Inc., 102 S.E.2d 345, 351 (Va. 1958). Because the interpretation of a written contract presents a question of law, we review the district

26

court's interpretation de novo.  See Seabulk Offshore, Ltd. v. American Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004).

Under Virginia law, "[i]t is well established that, when the terms of a contract are clear and unambiguous, a court must give them their plain meaning."  Pocahontas Mining Ltd. Liab. Co. v. Jewell Ridge Coal Corp., 556 S.E.2d 769, 771 (Va. 2002). A court determines a contract's plain meaning by giving its words "their usual, ordinary, and popular meaning."  Id. at 772. We therefore need to look at the Plan terms.

For most offices, the Plan unqualifiedly provides that particular Party committees will choose the nomination method. See Plan at Art. III, § D(1)(b) (providing that the ["State Central Committee"] will decide the nomination method for candidates for statewide public office); Plan at Art. IV, § D(1)(a) (providing that the "District Committee" will decide the nomination method for candidates for the United States House of Representatives; Plan at Art. VI, § D(1)(a) (providing that the "Unit Committee" will decide the nomination method for candidates for local and constitutional public offices).  This choice reflects the fact that Virginia law gives political parties the unqualified right to make those decisions with regard to their candidates for those offices.  See Va. Code § 24.2-509(A).  The Plan provision concerning the General Assembly, however, has a special proviso that reflects the Act's

27

potential to deny the Party the right to choose the nomination method. Accordingly, it states:

> The Legislative District Committee shall determine whether candidates for Legislative District public office shall be nominated by Mass Meeting, Party Canvass, Convention or Primary, <u>where permitted to do so under Virginia Law</u>.

Plan at Art. V, § D(1)(a) (emphasis added).

Central to these appeals is the question of how the emphasized language (the "qualifying language") applies if the Act, which gives the nomination-method decision to an incumbent, is unconstitutional. The Committee argues the Act is unconstitutional and cannot be applied, thus giving the election decision to the Committee. The Defendants contend that "Virginia Law" includes the Act, even if it is unconstitutional.

In my view, the plain meaning of the Plan is the one that the Committee urges. Both the United States Supreme Court and the Supreme Court of Virginia have held that the law of a particular state includes the United States Constitution, such that an unconstitutional Virginia statute is no law at all. <u>See</u> <u>Howlett ex rel. Howlett v. Rose</u>, 496 U.S. 356, 367 (1990) ("[T]he Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature."); <u>Ex parte Siebold</u>, 100 U.S. 371, 376 (1879) ("An unconstitutional law is void, and is as no law."); <u>Marbury v. Madison</u>, 5 U.S. 137, 180 (1803) ("[A] law repugnant to the constitution is

28

void."); <u>Spiak v. Seay</u>, 40 S.E.2d 250, 251 (Va. 1946) ("The provision of the Constitution of the United States on interstate extradition, together with the Acts of Congress on the subject, are a part of the supreme law of the land and therefore a part of the law of each State."). For that reason, the ordinary and natural meaning of "Virginia Law" does not include Virginia statutes that are void because they violate the U.S. Constitution.

Indeed, only days after we heard oral argument in the present case, the Supreme Court held that language nearly identical to that now before us <u>unambiguously</u> conveyed that very meaning. <u>See</u> <u>DIRECTV, Inc. v. Imburgia</u>, 136 S. Ct. 463, 469 (2015). In that case, DIRECTV entered into a service contract with its customers that included an arbitration provision that stated that it would be unenforceable if the "law of your state" made waivers of class arbitration unenforceable. <u>Id.</u> at 466 (internal quotation marks omitted). Another section of the contract provided that the arbitration provision "shall be governed by the Federal Arbitration Act." <u>Id.</u> (internal quotation marks omitted). Two of DIRECTV's customers brought suit in 2008 against DIRECTV in a California state court seeking damages for early termination fees that the customers alleged violated California state law. <u>See</u> <u>id.</u> Invoking the

arbitration provision, DIRECTV requested arbitration. See id. The state trial court denied the request. See id.

DIRECTV appealed to the California Court of Appeal, which affirmed. See id. at 466-67. Under that court's analysis, the enforceability of the arbitration provision turned on the effect of a rule of California state law that resulted from a 2005 California Supreme Court decision, Discover Bank v. Superior Court, 113 P.3d 1100, 1110 (Cal. 2005), and which was embodied in California statutory law as well (the "Discover Bank rule").[4] See DIRECTV, 136 S. Ct. at 466-67. Under the Discover Bank rule, the arbitration provision would have been unenforceable as a matter of California state law. See id. However, in 2011, the United States Supreme Court held that the Discover Bank rule was preempted and invalidated by the Federal Arbitration Act ("FAA") because the rule "st[ood] as an obstacle to the accomplishment and execution of the full purposes and objectives

---

[4] Discover Bank held "that a waiver of class arbitration in a consumer contract of adhesion that predictably involves small amounts of damages and meets certain other criteria" that were not contested in DIRECTV was "unconscionable under California law and should not be enforced." DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 466 (2015) (alteration & internal quotation marks omitted). The applicable California statutes referenced above were sections 1751 and 1781(a) of California's Consumers Legal Remedies Act. See id. at 466-67.

of Congress" that the FAA embodied. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 352 (2011).

Although it recognized that Concepcion had invalidated the Discover Bank rule, see DIRECTV, 136 S. Ct. at 467, the California Court of Appeal nonetheless believed that DIRECTV's entitlement to arbitration depended on the meaning of the contractual phrase "law of your state," see id. at 466. Concluding that the parties intended that phrase to mean "the law of California including the Discover Bank rule and irrespective of that rule's invalidation in Concepcion," id. at 468, the court affirmed the lower court's denial of DIRECTV's request to enforce the arbitration agreement, see id. at 467. And the California Supreme Court denied discretionary review. See id.

The United States Supreme Court then granted DIRECTV's petition for certiorari and reversed. The Court assumed that the California Court of Appeal's decision was correct as a matter of state contract law, but nonetheless considered whether that state law was consistent with the FAA. See id. at 468. The Supreme Court concluded that in ruling that "law of your state" included state laws that were invalidated by federal law, the California court did not "place[] arbitration contracts on equal footing with all other contracts." DIRECTV, 136 S. Ct. at 468-69 (internal quotation marks omitted). The Supreme Court

offered many reasons for its conclusion, most of which related to the fact that the California court's interpretation could not be justified in light of generally applicable law.[5]  See id. at 468-71.

The Court began by considering the ordinary meaning of the phrase "law of your state."  The Court concluded that the natural meaning is "valid state law."  Id. at 469.  In fact, the Court determined that it would not even be reasonable to read "law of your state" to include state law that was invalid under the Supremacy Clause.  See id.  And the Court noted that it had not found any contract case from any state "that interprets similar language to refer to state laws authoritatively held to be invalid."  Id.; see id. at 470 ("[W]e can find no similar case interpreting the words 'law of your state' to include invalid state laws.").

The Court also noted that construing "law of your state" to exclude law that was invalidated after the formation of the contract would be consistent with applicable principles of contract interpretation.  See id. at 469.  The Court

---

[5] The Court also noted that particular language the Court of Appeal used suggested that the court might have intended its holding to be limited to the arbitration context.  See id. at 470.

particularly cited California caselaw holding that plea agreements, which are construed according to normal contract principles, are "'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws.'" Id. (quoting Doe v. Harris, 302 P.3d 598, 601-02 (Cal. 2013)). And the Court referred to the fact that "judicial construction of a statute ordinarily applies retroactively." Id. (citing Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13 (1994)).

In my view, the reasons cited by the Supreme Court in DIRECTV also demonstrate that the phrase "Virginia Law" in the Plan before us here cannot be construed to include invalid Virginia statutes. Under the Supreme Court's reasoning, the ordinary meaning of the phrase "Virginia Law" is "valid [Virginia] law," and a reading that included invalid Virginia statutes would not even be reasonable. Id. (emphasis in original). Additionally, the contract and statutory principles that the DIRECTV Court relied on provide further support this interpretation, just as they supported the DIRECTV Court's similar interpretation.[6] See id.

---

[6] Similar to the California caselaw cited by the Supreme Court in DIRECTV, see id. at 469, the Supreme Court of Virginia has held, in the context of interpreting a plea agreement, that "contracts are deemed to implicitly incorporate the existing law and the reserved power of the state to amend the law or enact (Continued)

33

Because I would construe "Virginia Law" to encompass only valid Virginia law, I would read "Virginia Law" – and Virginia Code § 24.2-509(A) in particular – to "permit[]" the Committee to choose the nomination method in the event that § 24.2-509(B) is unconstitutional. See Va. Code § 24.2-509(A) ("The duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made."). And because I would read the Plan as authorizing the Committee to choose the nominating method in the event that § 24.2-509(B) is unconstitutional, I do not agree with the district court's conclusion that it is the Plan itself that is the cause of the parties' alleged injuries and an obstacle preventing redressability.[7] Accordingly, I would hold that the district

---

additional laws for the public welfare." Smith v. Commonwealth, 743 S.E.2d 146, 150 (Va. 2013).

[7] The fact that no court has determined prior to the initiation of this case that § 24.2-509(B) is unconstitutional has no bearing on standing. Under DIRECTV's reasoning, "Virginia Law" excludes invalid Virginia statutes, including unconstitutional statutes whose unconstitutionality had not yet been recognized by any court at the time the Plan was adopted. See DIRECTV, 136 S. Ct. at 466-71 (holding that the "law of your state" excluded state laws that, after the formation of the contract at issue – and after the initiation of the lawsuit at issue – were held by the Supreme Court to be preempted by the FAA). Consequently, if the Committee and Moxley are correct on (Continued)

34

court erred in concluding that the Committee and Moxley failed to establish standing under our Marshall decision.

B.

Defendants contend that, even if the Committee and Moxley would otherwise have established standing, they failed to do so because Virginia could have enacted legislation requiring a particular nomination method without running afoul of the Constitution. See Appellees' brief at 29-32 (citing Miller v. Brown, 503 F.3d 360, 368 (4th Cir. 2007)). However, even if Defendants are correct that Virginia could have constitutionally enacted such legislation, this argument at most goes to the merits of the claims asserted in this case; it does not relate to standing. See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2663-65 (2015) (Arizona legislature challenged statute on basis that it deprived legislature of its constitutional authority to initiate redistricting; although Court concluded that legislature did not have the authority it asserted, that point related only to the

---

the merits of their claims that § 24.2-509(B) is unconstitutional, then they are also correct, under the reasoning of DIRECTV, that "Virginia Law" does not include § 24.2-509(B) and that the Plan authorizes the Committee to choose the nomination method.

35

merits of the legislature's claim, not to its standing to assert the claim).

The Committee alleged injuries from operation of the Act in that it prevents it from selecting the nomination method for the General Assembly position at issue here. Moxley alleged injuries from the Act in that it was allowing his opponent to choose the nominating mechanism that he believed would best ensure his reelection. Both sought to have the Act declared void so that the Committee's designation of a convention would be upheld and their injuries could be avoided. These allegations were sufficient to establish that the dispute would "be resolved . . . in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," as the standing doctrine requires. <u>Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 472 (1982). I therefore believe the district court erred in dismissing this case for lack of standing.[8]

---

[8] The fact that Senator Hanger defeated Moxley in the primary long ago does not moot this appeal because the issues presented fit into the "capable of repetition, yet evading review" exception to the mootness doctrine. <u>See</u> <u>FEC v. Wisc. Right to Life, Inc.</u>, 551 U.S. 449, 462 (2007). Although this exception applies only if the issue is capable of repetition in regard to the same plaintiff, <u>see</u> <u>Stop Reckless Econ. Instability Caused by Democrats v. FEC</u>, 814 F.3d 221, 229-32 (4th Cir. 2016), there is a reasonable expectation that each of
(Continued)

II.

In sum, I would reverse the district court's judgment dismissing the complaints for lack of subject-matter jurisdiction. I respectfully dissent from the majority's contrary decision.

---

the plaintiffs and intervenor Moxley will be subject to the same action again in future elections, see North Carolina Right to Life Comm. Fund for Indep. Political Expenditures v. Leake, 524 F.3d 427, 435 (4th Cir. 2008) (holding that constitutional challenges to system of public financing for judicial elections, brought by two political committees and a candidate, were not mooted by the election even though neither the political committees nor the candidate had specifically alleged an intent to participate in future election cycles; concluding that "there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles"; rejecting "the argument that an ex-candidate's claims may be 'capable of repetition yet evading review' only if the ex-candidate specifically alleges an intent to run again in a future election").